COMMONWEALTH *vs.* CHERYL AMIRAULT LeFAVE.

Middlesex. May 6, 1999. - August 18, 1999.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, MARSHALL, & IRELAND, JJ.

*Constitutional Law,* Confrontation of witnesses, Assistance of counsel, Waiver of constitutional rights. *Practice, Criminal,* New trial.

A criminal defendant who, by not arguing the issue on appeal from her convictions, waived her right to challenge the denial of her right under art. 12 of the Massachusetts Declaration of Rights to confront child witnesses face to face, also waived her right to challenge the effectiveness of her counsel on appeal by not pressing that issue, which could have been raised, in presenting her first motion for a new trial [171-173], and the defendant did not, on a second motion for a new trial, demonstrate a substantial risk of a miscarriage of justice such as would warrant the grant of a new trial [173-175].

A criminal defendant's motion for a new trial, based on a claim of newly discovered evidence, was incorrectly granted, where the proffered expert opinion evidence did not differ in kind from the testimony that had been or could have been presented at the trial of the case. [175-178, 179-181]

INDICTMENTS found and returned in the Superior Court Department on January 21, 1985.

Following the decision of this court, 424 Mass. 618 (1997), motions for a new trial, filed on April 29, 1997, and October 16, 1997, respectively, were heard by *Isaac Borenstein,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Catherine E. Sullivan,* Special Assistant District Attorney (*Lynn C. Rooney, David W. Cunis, Abra C. Siegel, & Amy E. Bannes,* Assistant District Attorneys, with her) for the Commonwealth.

*Daniel R. Williams,* of New York, & *James L. Sultan* (*Catherine J. Hinton* with them) for the defendant.

The following submitted briefs for amici curiae:

*Kevin S. Nixon* for Scientists for the Accurate Communication of Data.

*Wendy J. Murphy* for Leadership Council on Mental Health, Justice, and the Media.

*Sherry A. Quirk* for One Voice/The American Coalition for Abuse Awareness. ·

WILKINS, C.J. We deal once again with consequences of the multiple convictions of Cheryl Amirault LeFave of rape of a child under sixteen years and indecent assault and battery on a child under fourteen years.[1] In *Commonwealth* v. *LeFave*, 407 Mass. 927 (1990), we affirmed those convictions, and in *Commonwealth* v. *Amirault*, 415 Mass. 112 (1993), we vacated the trial judge's order revising the sentences that he had imposed.

In 1995, a judge, not the trial judge (who had retired), allowed the defendant's first motion for a new trial. See Mass. R. Crim. P. 30, 378 Mass. 900 (1979). That motion alleged that she had been deprived of her right to "face-to-face" confrontations with the child witnesses against her, guaranteed by art. 12 of the Massachusetts Declaration of Rights. In *Commonwealth* v. *Amirault*, 424 Mass. 618 (1997), we agreed that the seating arrangement for the child witnesses violated the defendant's confrontation rights under art. 12. *Id.* at 632. We nevertheless vacated the order allowing the defendant's motion for a new trial and reinstated her original convictions. *Id.* at 653. We concluded that the defendant had waived the confrontation issue by not raising it earlier. *Id.* at 642-644. The art. 12 confrontation issue was clearly identified by the time the defendant's appeal from her convictions was heard, but it was not argued, and thus it was waived. *Id.* at 643-644. Indeed, before trial, a judge twice adverted to the possibility of a violation of the right to a face-to-face confrontation in the arrangement proposed for the seating of child witnesses, but in challenging the arrangement

---

[1] The judge sentenced the defendant to concurrent terms of from eight to twenty years on three rape convictions and concurrent terms of from eight to ten years on four indecent assault and battery convictions.

The defendant's mother, who was convicted of similar charges, died on September 12, 1997.

The defendant's brother Gerald was found guilty in 1986 in a separate trial on eight indictments charging rape of a child and seven indictments charging indecent assault and battery on a child. In *Commonwealth* v. *Amirault*, 399 Mass. 617 (1987), we affirmed an order, denying Gerald's motion for a new trial, and in *Commonwealth* v. *Amirault*, 404 Mass. 221 (1989), we affirmed his convictions and our order denying his renewed motion for a new trial. In *Commonwealth* v. *Amirault*, 424 Mass. 618, 653 (1997), we considered and affirmed the denial of Gerald's second motion for a new trial which was based on the same ground as the defendant Cheryl Amirault's first motion for a new trial.

defense counsel disavowed reliance on a right to confrontation. *Id.* at 623, 642 n.17.

The case is again before us, this time on our allowance of the Commonwealth's application for direct appellate review, because a judge in the Superior Court, in two separate rulings on independent grounds, has allowed the defendant's second and third motions for a new trial. The second motion for a new trial revisits the confrontation issue, asserting that counsel was ineffective in not raising the confrontation issue on direct appeal. The third motion for a new trial is based on a claim that newly discovered "scientific evidence" demonstrates that "due to the manner in which the allegations of child sexual abuse were investigated," evidence presented against the defendant was "wholly unreliable." We shall discuss in turn each order allowing the defendant a new trial and shall vacate both orders.[2]

### THE SECOND MOTION FOR A NEW TRIAL

The defendant's second motion for a new trial is based on the same alleged trial error on which her first motion was based: a claimed violation of her art. 12 right of confrontation. In the second motion, however, she raises the issue vicariously as a claim that she is entitled to a new trial because her counsel in her appeal from her convictions was ineffective, in a constitutional sense, in not arguing the confrontation issue. A major weakness in the defendant's contention is that the ineffectiveness of the defendant's appellate counsel, who were also her trial counsel, could have been presented in her first motion for a

---

[2]In addition, the judge ruled, in passing on the third motion for a new trial, that the child witnesses' testimony was "forever tainted" and that they would not be allowed to testify at any retrial. The judge relied on *State* v. *Michaels*, 136 N.J. 299 (1994), to rule that "the child witnesses will not be permitted to testify because they have been subjected to very serious and repeated impermissible interviewing and investigatory techniques and no independent evidence exists to support their claims. Thus, their testimony has been forever rendered unreliable." In the *Michaels* case, the Supreme Court of New Jersey sent the matter back for a "pretrial taint hearing" as to whether statements and testimony elicited by improper interview techniques nevertheless were reliable enough to warrant admission at trial. *Id.* at 320. Because we conclude that the defendant's second and third motions for a new trial should have been denied, we need not discuss whether the child witnesses would be disqualified from testifying at a new trial. The judge's statement that there was no independent evidence to support the child witnesses' testimony discounts the child witnesses' symptoms that were consistent with sexual abuse and the corroborating testimony of the children's parents.

new trial.[3] Her counsel on that first new trial motion were well aware of the ineffectiveness of counsel argument and indeed alluded in her brief to this court that her original defense counsel may have been ineffective. See *Commonwealth v. Amirault*, 424 Mass. at 645. On the record then before us, we commented on but did not rule on the possible ineffectiveness of original defense counsel at the trial.[4] We did not discuss the possible ineffectiveness of appellate counsel, but it is clear that the defendant had the opportunity to argue the issue as part of her first motion for a new trial.

The defendant waived the claim of appellate ineffective assistance of counsel because she had a fair opportunity to raise the denial of her confrontation right and "may not belatedly

---

[3]Because counsel on the defendant's direct appeal were also her trial counsel, the failure of counsel to argue on direct appeal that they were ineffective at trial is not treated as a waiver. *Commonwealth v. Egardo*, 426 Mass. 48, 49 (1997).

[4]In a footnote, the defendant's brief stated the following:

> "Surely, if the state of the law was such that trial counsel would be expected to register a constitutional objection, then trial counsel's failure in that regard was inexcusable and reflected incompetence. Accordingly, the defendants' federal and state constitutional rights to effective assistance of counsel was [*sic*] violated, since no rational trial strategy could account for the failure to object. See *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984)."

In response to this presentation, we said:

> "We do not suggest, as the defendants' new counsel invites us to do, that the original defense counsel in these cases were ineffective. Indeed they were experienced and mounted vigorous defenses, but the focus of their objections was elsewhere. Furthermore, like the constitutional right of the accused to testify in his own behalf, confrontation is not always an advantage to the accused: if the witness is firm as he confronts the accused, this may add to his credibility; while the very upset or even terror a child may show when confronted by the person he accuses may tell powerfully against the accused. Experienced and competent counsel might well have concluded that it was to the defendants' advantage to keep the emotional temperature as low as possible by not insisting on confrontation." (Footnotes omitted.) *Commonwealth v. Amirault*, 424 Mass. at 645.

We commented additionally that, "[i]n considering waiver, we are entitled to consider the defense's apparent lack of interest in this issue," and that "[i]nherent in the adversary system is the imperative that choices made by counsel are binding on the defendant." *Id.* at 645 nn.18 & 19.

invoke that right to reopen a proceeding that has already run its course." *Id.* at 639. "[T]he concern for finality demands that a defendant present every claim and argument he might fairly have had available to him the first time around." *Id.* Just as the defendant waived her right to challenge the denial of her art. 12 right to confront child witnesses face to face by not arguing the issue on appeal from her convictions, she waived her right to challenge the ineffectiveness of her counsel on appeal by not pressing the point in presenting her first motion for a new trial. See *id.* at 644.

The motion judge gave inadequate consideration to the question whether the defendant had waived the ineffective assistance of counsel claim by failing to argue the confrontation issue in connection with her first motion for a new trial. He stated that "the ineffective assistance of counsel argument was not presented as part of the first new trial motion." That is, as we have pointed out, not the test for determining waiver. The ineffective assistance issue was available when the first motion for a new trial was presented. The issue was certainly open to be argued, and the motion judge's conclusion that it was not "ripe" for determination is meritless. As noted already, the defendant identified the issue in her brief prior to our 1997 *Amirault* opinion.

The judge was not entitled, under Mass. R. Crim. P. 30 (b) or otherwise, to grant a new trial without considering and deciding the consequences of the fact that the defendant had waived the ineffective assistance issue. *Commonwealth* v. *Amirault*, 424 Mass. at 640. The power to give relief when a waived issue is "raised for the first time by a [postconviction] motion for a new trial should be exercised only in those extraordinary cases where, upon sober reflection, it appears that a miscarriage of justice might otherwise result." *Commonwealth* v. *Curtis*, 417 Mass. 619, 626 (1994), quoting *Commonwealth* v. *Harrington*, 379 Mass. 446, 449 (1980). See *Commonwealth* v. *Watson*, 409 Mass. 110, 112 (1991); *Commonwealth* v. *Deeran*, 397 Mass. 136, 139 (1986); K.B. Smith, Criminal Practice and Procedure §§ 2070, 2084 (Supp. 1999) ("the rule of waiver applies equally to constitutional claims which could have been raised, but were not raised on direct appeal or in a prior motion for a new trial").

The only basis on which the motion judge could properly have dealt with the waived ineffective assistance of counsel issue was on the standard of a substantial risk of a miscarriage of

justice. See *Commonwealth* v. *Amirault*, 424 Mass. at 646; *Commonwealth* v. *Curtis*, *supra* at 626. We considered the waived confrontation issue in the appeal from the allowance of the first motion for a new trial and concluded that the defendant had not met her burden of showing that there was a substantial risk of a miscarriage of justice in the circumstances of the child witnesses' testimony. *Commonwealth* v. *Amirault*, 424 Mass. at 653. The fact that the defendant has grounded her substantial risk of a miscarriage of justice claim on the ineffectiveness of appellate counsel in failing to argue the confrontation issue in the direct appeal from her convictions adds nothing to her position.[5]

The results of the court's recent efforts to define a substantial risk of a miscarriage of justice do not alter the conclusion expressed in *Commonwealth* v. *Amirault*, *supra* at 645-651, that the defendant did not meet her burden of showing that there was a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Alphas*, *ante* 8, 13 (1999). This court's traditional treatment of the substantial risk issue calls for us to decide if we have a serious doubt whether the result of the trial might have been different had the error not been made. *Id.* (no substantial risk of miscarriage of justice if court persuaded that error did not materially influence guilty verdict).[6] That standard was the principal consideration in Justice Cutter's seminal

---

[5]The defendant relies on Mass. R. Crim. P. 30 (c) (2), 378 Mass. 900 (1979), to argue that the motion judge on the second motion for a new trial had discretion to permit the issue of ineffectiveness of counsel to be examined on its merits. That rule provides that all grounds for relief must be raised in the defendant's original or amended motion, and, if any ground is not raised, it is waived "unless the judge in his discretion permits [it] to be raised in a subsequent motion, or unless such grounds could not reasonably have been raised in the original or amended motion." Under rule 30 (c) (2), the motion judge must apply the same substantial risk of a miscarriage of justice standard that we discuss above. A motion judge's discretion under rule 30 (c) (2) to grant relief from such a waiver is limited if the conviction has already received appellate review. See *Commonwealth* v. *Curtis*, 417 Mass. 619, 623, 626 (1994); *Commonwealth* v. *Watson*, 409 Mass. 110, 112 (1991); *Commonwealth* v. *Harrington*, 379 Mass. 446, 449 (1980).

[6]The defendant argues strenuously that we should grant a new trial because the art. 12 violation was not harmless beyond a reasonable doubt, a standard used in reviewing preserved constitutional errors. This standard of review is inapplicable, however, when a defendant has waived her claim of error, and we review the alleged error on the substantial risk of a miscarriage of justice standard. See *Commonwealth* v. *Amirault*, *supra* at 646-647; *Commonwealth* v. *Curtis*, *supra* at 626. The standard of review that we discuss in this case is

opinion advancing the test of a substantial risk of a miscarriage of justice. *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). We applied the standard in *Commonwealth* v. *Amirault*, 424 Mass. at 647, where we said that there would be a substantial risk of a miscarriage of justice if we were left "with a serious doubt that the defendants' guilt had been fairly adjudicated."

We repeat what we said in *Commonwealth* v. *Amirault*, 424 Mass. at 653: "[A]ll of the child witnesses in the two trials testified in the physical presence of the defendants, testified under oath, were subject to cross-examination, and sat in front of the jury who could observe their demeanor and assess the weight and credibility of their testimonies. Moreover, there were several actual face-to-face encounters with the child witnesses throughout the trial. . . . We conclude that in these circumstances, the defendants have not met their burden of showing there was a substantial risk of a miscarriage of justice." (Citation omitted.) We are additionally warranted in our conclusion that the seating arrangement for the child witnesses was not particularly significant by the decision of experienced defense counsel not to challenge that arrangement on art. 12 grounds, even when the judge inquired whether he wished to do so. *Commonwealth* v. *Amirault*, *supra* at 626, 645 n.18.

The forceful, one might say enthusiastic, indorsement of an interest in finality and the application of waiver in *Commonwealth* v. *Amirault*, *supra* at 639-644, apparently struck some as a radical and unwelcome departure from precedent. In fact, the *Amirault* opinion made no significant change in our treatment of postappeal motions for a new trial. It articulated society's justified interest in finality that has long been implicit, and sometimes explicit, in our announcements that any late-arriving issue will prevail only if the issue presents a *substantial* risk of a miscarriage of justice. The defendant's second motion for a new trial should have been denied.

THE THIRD MOTION FOR A NEW TRIAL

The defendant's third motion for a new trial is based on a

---

also different from that applied in review of a denial of a new trial motion that occurs in conjunction with (or prior to) consideration of the direct appeal from a defendant's conviction. See *Commonwealth* v. *Hallet*, 427 Mass. 552, 554 (1998).

claim of newly discovered evidence.[7] A defendant seeking a new trial on that ground must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction. *Commonwealth* v. *Grace*, 397 Mass. 303, 305 (1986). Newly discovered evidence is evidence that was unavailable at the time of trial and could not have been discovered with reasonable diligence. *Commonwealth* v. *Moore*, 408 Mass. 117, 126 (1990). *DeLuca* v. *Boston Elev. Ry.*, 312 Mass. 495, 497 (1942).

In reviewing an order granting or denying a motion for a new trial, we accord deference to the views of a motion judge who was also the trial judge. *Commonwealth* v. *Grace*, *supra* at 307. If, however, as here, "the motion judge did not preside at trial, we defer to that judge's assessment of the credibility of witnesses at the hearing on the new trial motion, but we regard ourselves in as good a position as the motion judge to assess the trial record." *Id.*

The defendant claims that the testimony of Dr. Maggie Bruck, who has a doctorate in experimental psychology, constitutes newly discovered evidence that explains how children can speak of disturbing sexual acts that they did not experience. The judge found that there were no studies available at the time of trial that identified the impact of suggestive interviewing techniques on the reliability of the testimony of the child witnesses. He, therefore, determined that the studies on which Dr. Bruck relies were newly discovered. The judge also found that without Dr. Bruck's testimony the jury could not have understood the dangers of suggestive interviewing procedures. He concluded that had Dr. Bruck's testimony been available at trial, there is a substantial risk that the jury would have reached different verdicts.

This conclusion has meaning for the purposes of the defendant's new trial motion only if the proffered evidence was in fact newly discovered. Perceived deficiencies in the Commonwealth's case have no role to play in deciding whether the evidence was new. Thus, much of the judge's thorough and critical analysis of the Commonwealth's evidence at trial, although relevant to other issues that he considered, is not relevant to the question whether, for the purposes of Mass. R.

---

[7] We shall assume, but not decide, that the defendant should not be faulted for failing to raise the issue in conjunction with her second motion for a new trial.

Crim. P. 30, Dr. Bruck's expert testimony was new. We conclude that it was not.

Dr. Bruck's testimony was, of course, new in the sense that she did not testify at the defendant's trial. Similarly, studies to which Dr. Bruck referred were new in the sense that they were published after the trial. Her testimony, based on these studies, does not differ in kind, however, from the testimony presented at trial. The evidence available at the time of the defendant's trial included extensive opinion evidence on the very subject of improper interviewing practices that the defendant argued made unreliable the incriminating testimony of the child witnesses.

The motion judge made a significant error in concluding that Dr. Daniel Schuman was not permitted to testify at the defendant's trial regarding the unreliability of testimony based on improper interviewing practices. The judge may have been led to that conclusion because out-of-State counsel for the defendant, in presenting evidence in support of the motion, twice erroneously insisted that Dr. Schuman had not been allowed to testify before the jury.[8] Because the judge erroneously determined that Dr. Schuman's testimony had been excluded, he erroneously concluded that his testimony was not available at the time of the defendant's trial. Moreover, the judge inexplicably does not mention or appear to consider the expert testimony of Dr. Sherry L. Skidmore and Dr. William D. Erickson which the defendant presented at trial.[9] The judge's misapprehension seems to have caused him to conclude that "[w]hile this Court agrees with the general proposition that 'more' research may

[8]The question at the pretrial hearing was whether Dr. Schuman's opinion testimony was generally accepted and of sufficient weight under the principles of *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923), so as to require the complete exclusion of the children's testimony.

[9]The judge further concluded that under *Commonwealth* v. *Lanigan*, 419 Mass. 15 (1994), Dr. Bruck's opinion would be admissible, and that her testimony would not intrude on the province of the jury to assess the credibility of witnesses. We need not reach these issues. The admissibility of such evidence under our *Lanigan* opinion remains an open question. Compare *United States* v. *Rouse*, 111 F.3d 561, 567-573 (8th Cir.), cert. denied, 522 U.S. 905 (1997) (holding expert opinion regarding suggestive interviewing techniques and their effects admissible under *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 [1993]), with *State* v. *Foret*, 628 So. 2d 1116, 1127 (La. 1993) (noting that testimony based on psychodynamic theories is of "highly questionable scientific validity" and "fails to unequivocally pass the *Daubert* threshold"), and Richardson, The Problems of Applying Daubert to Psychological Syndrome Evidence, 79 Judicature 10 (July-Aug. 1995).

not present sufficient grounds for a new trial, this is not such a case." The judge concluded that, at the time of the defendant's trial, there was an unanswered question: "How could children come to speak of disturbing sexual acts if they did not suffer them?" The answer to this question was available for the defendant to advance at her trial. The defendant presented evidence at her trial tending to show that the child witnesses' testimony was unreliable as a result of improper interviewing techniques. The jury nevertheless believed the child witnesses, despite evidence of the use of improper interviewing techniques and the opinions of the defendant's experts.

We first set forth opinions that Dr. Schuman gave in the pretrial proceedings. He testified that it was obvious that the interviewing skill and comportment of the interviewer was "a critical variable." The offering of a reward to a child for telling the interviewer what he or she wants to hear is inappropriate. Depriving a child of something unless the child gives a particular account is highly coercive. Inducements are improper and render the results invalid. Children who are pressured may pick up the fact and often will fit themselves into the "set of social expectations." Authority figures and persons in uniforms create an aura of pressure. A biased interviewer who gives positive reinforcement to answers that are desired or expected will cause a child witness to expand on those answers. The child may conform to the expectations of what the child is supposed to say and becomes increasingly convinced of the accuracy of what he or she has said. Repetitive interviews and multiple interviewers of a child affect the child's capacity to report with neutrality. Interviews in an emotionally charged atmosphere or by someone who is emotionally invested in the outcome may affect the child's statements. It is a generally accepted understanding in psychiatry that circumstances that have a meaningful impact on the children alter children's memory, conviction, and belief.[10]

At the defendant's trial, two experts, Dr. Skidmore and Dr. Erickson, testified on her behalf. They noted the importance of

[10]At Gerald's trial, Dr. Schuman testified that, if a parent, caretaker, or other powerful figure on whom the child relies is fearful or angry about something, "the child, in an effort to maintain the bond, in an effort to reach out altruistically, becomes reassuring, compliant, and accommodating to expectations, including fearful expectations." Dr. Schuman also noted at Gerald's trial that the tone of the interview should be neutral, free of pressure, and anxiety.

a neutral interviewer and the need to avoid adult influences to which children are particularly susceptible. Each also identified and criticized many of the same interview techniques described by Dr. Bruck in the defendant's presentation in support of her third motion for a new trial. Interviewers should use open-ended rather than leading questions to ensure that the information comes only from the child. Repetitive questions pressure a child to give different answers. Dr. Skidmore testified that interviews of a child should not be held in an authoritative place, such as a principal's office or a police department, or conducted by authoritative-looking interviewers. Both Dr. Erickson and Dr. Skidmore testified that children frequently mix fact and fiction and that they can fantasize about sexual contact. Each commented on an interviewer's improper uses of anatomically correct dolls which was apparent in videotaped interviews of child witnesses shown to the jury. Both experts testified to the negative effects of referring to statements of a child's peers because the technique could shape the response. There was expert opinion evidence available that the impact of the use of multiple improper interview techniques would be cumulative.

In presenting Dr. Bruck's testimony, the defendant acknowledges that the same concepts regarding interviewing techniques were presented or available at the time of her trial. She argues, however, that Dr. Bruck's ability to discuss the consequences of coercive interview techniques makes her testimony new. She asserts that the expert testimony available at trial could not explain how suggestive interview techniques can lead a child to make false allegations of sexual abuse. The defendant argues, therefore, that Dr. Bruck's testimony is not simply "better than" the testimony offered at trial because she would discuss recent studies that answer the question unanswerable at trial, namely: "How could children come to speak of disturbing sexual acts if they did not suffer them?" Dr. Bruck's opinion is that, when suggestive interviewing techniques are used, "children may not only come to falsely report acts of sexual abuse, but they may come to believe that they experienced the events they reported. These children's memories may be permanently tainted by the sexualized suggestions of their interviewers. These children can appear highly credible both to subsequent interviewers, to family, and to jurors."

This opinion, however, does not differ significantly from the defense's theory before and at trial. In her memorandum in sup-

port of her pretrial motion to dismiss, the defendant stated that "repeated interviewing of young children can induce in those children the subjective belief that things are true, when in fact they are not."[11] Dr. Skidmore similarly testified at trial that children may incorporate ideas into their memory derived from suggestive questioning and that pressure by an interviewer could modify children's behavior as well as responses to questions. Dr. Erickson noted that interviewing techniques may reinforce a story and fix it in a form which is repeated. In sum, the answer provided by Dr. Bruck to the so-called unanswerable question is

---

[11]The defendant supported this proposition with several citations, including the following quotes:

> "There is a myth propagated by 'abuse detectors' that 'children don't lie about these things.' Yet there is no real evidence to back this up. On the contrary Jean Piaget, in his monumental work, *The Moral Development of Children*, showed that, until age five or six, a lie is whatever an adult says it is, notwithstanding the often clumsy attempts by prosecutors and child service workers to establish that the child knows the difference between truth and falsehood.
>
> "Additionally, a child's responses can be conditioned by the complaining parents and/or investigator's beliefs and responses (intentional and unintentional) to what the child says or does. And, as previously mentioned, the reinforcement the child typically gets in these interrogations is a powerful factor in shaping its own responses and imbedding them in its conscious mind. Add repetition to this, and it is all too easy for the child to confuse objective and subjective reality. It is obvious that this can be tragic for the accused; it is also tragic for the developing child who, at an unconscious level, suffers disturbance resulting from this schism."

McIver, The Case for a Therapeutic Interview in Situations of Alleged Sexual Molestation, The Champion, 11, 12-13 (Jan.-Feb. 1986).

> "It is entirely possible for otherwise ambiguous activities then to be elaborated by the child or other reporters into genuine, truthful, but nonvalid perceptions of abuse. A poignant emotional reality is that children in such situations are not 'lying' but are not 'telling the truth' either in the customary or testimonial sense. The child may have sufficient abstract concepts of right/wrong or truth/falsehood to qualify as a competent witness *in general*, but in the particular matter at hand the child may well be incapable of distinguishing an 'objective' truth from inevitable subjective interpretations."

Schuman, False Accusation of Physical and Sexual Abuse, presented at the Annual Conference of the American Academy of Psychiatry and the Law (Oct. 1984).

not remarkably different from that presented by or available to the defendant at trial.

The defendant's allegedly new evidence lacks the characteristics necessary to qualify as newly discovered evidence that could warrant granting a new trial. Contrast *Commonwealth* v. *Meggs*, 30 Mass. App. Ct. 111 (1991). The important point is that Dr. Bruck's proposed testimony was corroborative of evidence available at the time of trial. Her evidence would have simply tended to support the opinion evidence, available at the time of the defendant's trial, that improper investigatory techniques could cause a child witness to state false facts. Undoubtedly, recent research has broadened the scientific community's understanding of the effects of suggestive questioning. We are faced, however, with the conflict between the constantly evolving nature of science and the doctrine of finality. In weighing these competing factors along with the interests of justice, we have concluded that expert testimony may not be considered newly discovered for purposes of a new trial motion simply because recent studies may lend more credibility to expert testimony that was or could have been presented at trial. To hold otherwise would provide convicted defendants with a new trial whenever they could find a credible expert with new research results supporting claims that the defendant made or could have made at trial.

CONCLUSION

The orders allowing the defendant's second and third motions for a new trial are vacated, and orders shall be entered denying both motions.

*So ordered.*