Welch, Richard E., J.
Introduction
Like a rising tide, science and knowledge move forward relentlessly. Past trials are static. At times they represent a snapshot of our knowledge as of the date the jury delivers its verdict. The rub comes when scientific advancement furthers — or even alters — understanding after a conviction. This issue is presented by the present motion.
The three defendants, each convicted of murdering Robert and Patricia Paglia, jointly file this fourth motion for new trial. In this motion the defendants claim that newly discovered evidence undermines the testimony of a key witness and necessitates a new trial. The defendants argue that the National Research Council’s recent report, dated February 10, 2004, and entitled “Weighing Bullet Lead Evidence” precludes the expert testimony offered by the Commonwealth in this case which linked two bullets (one found in a victim and another in defendant Costa’s basement) to the same box or batch of ammunition.[1]
At the hearing on this motion, Mr. William Tobin, a metalurologist, testified on behalf of the defendants. Trial counsel for defendant Costa gave a heartfelt presentation and appellate counsel argued this motion forcibly and eloquently.
After consideration of the evidence presented in support of this motion and after careful review of the trial transcript, this motion must be denied.
Background and Findings
The defendants, Dennis Daye, Richard Costa, and Michael DeNictolis, were each convicted of two counts of murder in the first degree and two counts of armed assault in a dwelling. A key witness at trial was Karen Moodie. Moodie, Costa’s girlfriend, testified extensively about the defendants’ plans to rob Robert and Patricia Paglia and Costa’s admission after the robbery that led to their murders. Moodie provided a variety of details including that the defendants had practiced shooting in the basement of a Rye, New Hampshire house associated with defendant Costa. FBI Special Agent Riley testified as an expert on compositional analysis of bullet lead. His testimony corroborated Karen Moodie’s testimony. Special Agent Riley testified as an expert as to how, through testing of the bullets, he was able to determine that one of the bullets found in Patricia Paglia’s body and the bullet found in the basement of the Rye, N.H. home were “from the same box of ammunition, or from another box of ammunition that was produced at the same place on or about the same date.” [Tr. July 7-14 pp. 34-35.) This testing is termed comparative or compositional analysis of bullet lead (“CABL”). It consists of Neutron Activation Analysis (“NAA”) and a second technique called Inductively Coupled Plasma Emission Spectrum (“ICP”).
At trial, Costa’s attorney questioned Riley about his techniques in interpreting the CABL evidence; the number of elements required to make a bullet match; whether any scientific standards governed such matches; and the manufacturing and distribution process of ammunition. The defendants also presented the testimony of their own expert, Dr. Stephen Morris, who refuted Riley’s testimony and discredited his testing techniques. Dr. Morris relied in part on a report known as the Lukens Report that opined that there did not exist a sufficient scientific basis to support Agent Riley’s bullet matching testimony. This dispute *675 between the respective experts was argued extensively (albeit unsuccessfully) by the defendants in their direct appeals to the Supreme Judicial Court. See Appellate Brief of Defendants pp. 229, Commonwealth’s Appendix. The defendants argued that Dr. Morris’ testimony established that: Agent Riley gave false or misleading testimony; there existed no general acceptance or valid scientific basis for the NAA or ICP analysis; and the tests were manipulated. Id at 229-30.
The defendants filed their first motion for a new trial on October 16,1989, which Judge Ronan, the trial judge, denied. The Supreme Judicial Court upheld their convictions and the denial of the motion for a new trial on January 29, 1992. The defendants filed a second motion for a new trial on January 28, 1994, which Judge Donovan (Judge Ronan having retired) denied. The defendants then filed a “gatekeeper” petition pursuant to G.L.c. 278,33E, for leave to appeal, which a single justice of the Supreme Judicial Court denied. The defendants filed their third motion for a new trial on August 24, 2001. Judge Rouse denied this motion. Again a single justice of the Supreme Judicial Court denied the defendants’ request to leave to appeal. The defendants filed the current motion on February 4, 2005.
In the present motion, the defendants argue that a new report by the National Research Council,[2] which strongly criticizes the FBI’s interpretation of CABL evidence, such as that which was introduced through Special Agent Riley’s testimony at trial, is newly discovered evidence. The NRC report identifies numerous cases, including this one, when criticizing the testimony of expert witnesses who, when interpreting CABL evidence, stated that ammunition came from the same “box” or a box manufactured on or about the same day.
To avoid confusion, a bit of background is important. Various lead manufacturers produce the lead that later becomes the projectile in a bullet. This lead is manufactured by melting large quantities and then sending it along to the bullet manufacturer. This melted lead contains not only lead but also various trace elements such as copper, silver, or antimony. The amount and existence of these trace elements apparently can be precisely measured during the manufacturing process. Neutron Activation Analysis and Inductively Coupled Plasma Emission Spectrum techniques can reveal and measure these trace elements from a lead bullet proj ectile. Linking a “crime” bullet to another known bullet obviously would have forensic significance.
The National Research Council report was commissioned by the FBI and was the product of research by numerous leading experts in the field including chemists, metallurgists, and others. (See Exhibit 1 to Defendants’ Motion.) The report is not only reliable and credible; it represents the most current, established scientific opinion on CABL evidence. The report finds the type of lead analysis used in this case, i.e. the NAA and ICP testing, to be reliable. (Report, p. 95.) The report also finds that there is a legitimate use for such analysis in criminal trials and endorses the concept that there can be, within a large lead melt, a compo-sitionally indistinguishable volume of lead (CIVL) produced by a manufacturer. The fact that certain lead melts may not be homogeneous (i.e. different parts or stratas of these large melts may exhibit different chemical characteristics) increases — rather than decreases — the relevance and reliability of analyzing a bullet and matching it to a particular manufacturer’s melt. See NCR Report, pp. 96-98 (“The principal risk of inhomogeneity is a false negative — two bullets declared not to match when they come from the same melt”).
The NRC report acknowledges that there may well be “coincidentally identical CIVLs,” i.e. different melts at different times may produce volumes of lead that are compositionally indistinguishable. The frequency of such coincidentally identical CIVLs “is unknown.” A recent study co-authored by defendants’ new expert, Mr. William Tobin, indicates the possibility of coincidental CIVLs (or a “false positive”) to be about 1 in 500. FBI studies show a much lower rate of false positives. The NRC report does not endorse either of these conflicting studies and finds the methodology of both to be flawed. Report pp. 98-99 and p. 99 note 115.
The NCR report strongly criticizes the practice, utilized in the trial of this case, of an expert witness opining that a “crime bullet came from, or is likely to have come from, a particular box of ammunition . . . or a box manufactured at the same time.” Report, p. 107. There is a leap between establishing a probability that a crime scene bullet came from the same melt (or, to be more precise, the same CIVL) as other bullets possessed by the suspect and the proposition that the crime scene bullet came from the suspect. This later proposition cannot be scientifically established.
A conclusion that two bullets came from the same melt does not justify an expert in further testifying that this fact increases the odds that the crime bullet came from the defendant. The large number of bullets from a single melt and the absence of information on the geographic distribution of such bullets precludes the testimony as a matter of expertise. Such an inference is a matter for the jury.
NRC Report, p. 102 (emphasis in original).
Based upon the NRC report, Special Agent Riley’s testimony would have to be more limited than the testimony elicited at trial. Accepting the NRC report (as this judge does), Special Agent Riley could testify concerning the CABL technique and the fact that it has been endorsed by the NRC. He could also testify that bullets from the same CIVL “are more likely to be analytically indistinguishable than bullets from different CIVLs.” Furthermore, the agent could opine that finding two bullets which are “analytically indistinguishable increases the probability that the two bullets came from the same CIVL,” i.e. the same portion of the same melt that produced the other bullet. The *676 agent would also need to acknowledge the possibility of a false positive, i.e. there is evidence that bullets from different melts/manufacturers “can sometimes coincidentally be analytically indistinguishable.” NCR Report, p. 107. Agent Riley could not now testify, given the state of the science as explained in the NRC report, that the bullet in the Costa basement came from the same box or batch as the bullet that was found in Mrs. Paglia. The prosecutor, however, could argue this inference to the jury. NRC Report, p. 102.[4]
In some respects, the NRC report is an outgrowth of the so-called “Lukens Report” authored in 1970. See H.R, Lukens et al., “Forensic Neutron Activation Analysis of Bullet-Lead Specimens” (June 30, 1970). The defendants’ expert Dr. Morris cited this report during his trial testimony. The Lukens Report noted weaknesses in the type of CABL analysis performed by Special Agent Riley in this case. The report, like the NCR report, addresses the issue of “false positives” in using the CABL analysis. The report notes that “two bullets with the same pattern of only three identification points are not usually definitively identified as having a common source.” Lu-kens Report, p. ii. The report discusses the methods of identifying bullet lead by analyzing the amount of antimony and usually two other elements (e.g. copper, arsenic, silver, etc.) in a lead melt. The report concludes that the test may be used to exclude a bullet from being from the same “lot” (or “CIVL” to use phrasing of the NRC report), but the test should not be used as an expert forensic device to prove that the bullet came from the same “lot.” Lukens Report, p. 2. Because “matching concentrations of all three elements does not indicate that two bullets come from the same lot,” the Lukens Report recommended that other more unique trace elements in each lot of bullets be analyzed before expert forensic evidence could be offered. Lukens Report is much more of a work-in-progress scientific study than the NRC report drafted some thirty years later. That report, however, raised a red flag that there was a serious issue of the CABL analysis producing “false positives” when linking two bullets to a common source (e.g. “in cases where the weapon involved in a shooting incident could not be found, it could be of interest to compare an evidence bullet with an unfired bullet found in the possession of a suspect”). Lukens Report, p. 4.
Dr. Morris was well prepared for his testimony. In extensive and detailed testimony he debunked Special Agent Riley’s testimony that there was a match between the bullet in Ms. Paglia and the bullet found in the Rye, N.H. basement. Trial Transcript, July 15, 1997, pp. 33-42, 42-49. But Dr. Morris’s testimony went further than this and attacked the type of CABL technique relied upon by Special Agent Riley. First, echoing the Lukens Report, he found that Riley had not utilized sufficient points of comparison. See Trial Transcript, July 15, 1997, p. 50 (“In this case . . . only five points of comparison emerged. In my view, this is not enough... finding a common origin is a tremendous burden on the analyst and should not be taken lightly”). Dr. Morris also voiced concerns, later echoed in the NRC report, that there might well be far too many bullets with “the same elemental composition” as the bullets in question. In other words, the possibility of coincidental matches, or “false positives,” was too high to link any bullet to a specific manufacturer or date of manufacture (never mind a particular box or batch).
In this regard, Dr. Morris testified about ammunition manufacturing practices and stated:
There is no particular control of these elements and the raw materials, the manufacturers maintain no quality control program on these elements, and consequently there is no way to know how many bullets have been produced in this country or any other country, this week, this month or this year, or in fact ever that would have the same elemental composition . . .
Trial transcript, July 15, 50. See also Trial Transcript, pp. 68.
The defendants’ current expert, Mr. William Tobin, testified at the hearing on this motion. His testimony tracks much of Dr. Morris’s statement. He has studied lead manufacturers’ methods and has found that different manufacturers use different methods that affect the homogeneify of the lead source. The only available data on the elements within the lead pours is kept, on a rather haphazard basis, by the lead manufacturers.[5]
Furthermore — echoing Dr. Morris — Mr. Tobin testified that there could exist a huge, albeit unspecified, number of bullets throughout the country that would “match” other bullets, i.e. have the same elemental composition. As Mr. Tobin testified, he agreed with all of Dr. Morris’s trial testimony. To this extent, Mr. Tobin’s recent studies and testimony, together with the NRC report, buttress the opinion of the defendants’ trial expert witness. In short, Special Agent Riley’s analysis and scientific method must be rejected because it is unreliable and liable to produce many “false positive” results.
Mr. Tobin’s testimony goes further than what is set forth above. Citing his own studies, Mr. Tobin goes well beyond the NRC study and finds CABL to be “junk science.” Given the huge number of bullets produced from a single pour, the possible distribution patterns of the bullets, and the number of analytically indistinguishable lots or pours, Mr. Tobin finds no value in CABL and doubts that there is any such thing as a compositionally indistinguishable volume of lead (CIVL). Mr. Tobin’s views, if accepted, are different than anything presented at trial or in the recent NRC report. Whether these views constitute new evidence need not be resolved because this judge simply does not credit Mr. Tobin’s testimony on these more extreme positions. Mr. Tobin, formerly a forensic metallurgist at the FBI Laboratory for 24 years, has impressive experience and knowledge. His testimony, however, smacks of the partisan crusader rather than a dispassionate scientist. His lack of credibility is underscored by his inability to directly answer a ques *677 tion, his insistence on giving a pre-planned recitation, and his constant self-promotion.[6] This judge can think of no expert witness he has found less credible.
Equally important, Mr. Tobin’s studies of lead content and bullet distribution cannot be considered to be reliable, complete, or scientific. The study of indistinguishable lead lots (Exhibits 1 and 2) is based only upon two lead manufacturers and selects certain lots from an unknown total. The study also relies on the manufacturers’ own haphazardly kept records. Mr. Tobin’s bullet distribution study is based on only two locations (a Walmart near his home and Juneau, Alaska where he went on a business trip). This study consists of asking a clerk to read off packing numbers and proves little. Mr. Tobin’s studies and testimony stand in marked contrast to the careful analysis of both the Lukens and NRC reports and the measured, detailed testimony of Dr. Morris.
Discussion
Ajudge “may grant a new trial at any time if it appears that justice may not have been done.” Mass.RCiv.P. 30(b). “A defendant seeking a new trial on the grounds of newly discovered evidence must establish that the evidence is newly discovered and that it casts real doubt on the justice of the conviction.” Commonwealth, v. Grace, 397 Mass 303, 305 (1986). Newly discovered evidence is evidence that was unavailable at trial and could not have been discovered through reasonable diligence. Commonwealth v. LeFave, 430 Mass. 169, 181 (1991), citing Commonwealth v. Moore, 408 Mass. 117, 126 (1990). Doubt is cast on the justice of the conviction if “there is a substantial risk that the jury would have reached a different result had the evidence been admitted at trial.” Grace, 397 Mass, at 306.
In LeFave, the Supreme Judicial Court found that “expert testimony may not be considered newly discovered for purposes of a new trial motion simply because recent studies may lend more credibility to expert testimony that was or could have been presented at trial.” 430 Mass at 181. In LeFave, the defendant sought a new trial after being convicted of several counts of rape of a child under the age of sixteen. Id. at 806. The issue raised in the defendant’s motion for new trial concerned the techniques used to interview children regarding allegations of sexual abuse and the unreliability of testimony based on improper techniques. Id. at 176. The defendant argued that the testimony of the expert, which would be based on studies conducted since the trial, was newly discovered evidence. Id. In concluding that such evidence was not newly discovered for the purposes of a motion for new trial, the Court found that research which broadens the scientific community’s understanding of an issue is not newly discovered if it only tends to corroborate the evidence available at the time of trial. Id. at 181. The Court found that the experts who had testified at trial had testified about the unreliability of improper interviewing techniques. Id at 177.
Having discounted some of Mr. Tobin’s testimony, the defendants’ motion in the present case is based on the NRC report. That report certainly expands the CABL research and strongly buttresses the trial expert’s criticisms of Special Agent Riley’s analysis. But the NRC report does not discredit CABL as a scientific tool. Indeed the report anticipates its relevance at trial. The report, albeit in a more authoritative and exhaustive manner, tracks the criticisms of Dr. Morris concerning the possibility of false positives which would preclude an expert from linking a bullet to the same box or batch. The NRC report bolsters the testimony of defendants’ trial expert and strengthens the defendants’ attacks on Riley’s testimony. Dr. Morris’s trial testimony does not dwell long on the manufacture of bullets and the possibility that a large number of bullets “would have the same elemental composition.” But that is not the point. The issue is whether this was evidence available at trial, even if that evidence represents a scientific finding that is later broadened and deepened with further research. Here the evidence was not only available, it was utilized. It cannot be considered “newly discovered” evidence. LeFave, supra at 181.
Given that the new report only adds strength to the previous state of knowledge utilized by defendants’ expert this is not a situation where an entirely new basis of scientific knowledge (e.g. DNA) is established and accepted post-trial. Dr. Morris and, to a lesser extent, the Lukens Report provided the heart of this still-evolving defense at trial.
The National Research Center report questions the scientific reliability of various practices employed by the FBI. Most significant to this case, the report criticized the conclusion, based on the interpretation of CABL evidence, that opined that the bullets came from the same “box” or batch of ammunition. The report finds that the probative value of a compositional match was often overstated and that essentially all that could be determined based on CABL evidence was that bullets with a certain compositional match came from a “compositionally indistinguishable volume of lead” (“CIVL”). This opinion was based in part of on the National Research Center’s findings that the wide variations in ammunition manufacturing and distribution made such a “same box” conclusion impossible to state with reasonable scientific certainty.
At trial, through cross-examination of Special Agent Riley and the testimony of their own expert Dr. Morris, the defendants challenged Riley’s conclusions that the bullets came from the same box. Costa’s attorney questioned Riley’s certitude in light of the variations in the manufacturing and distribution of ammunition. [July 14, pp. 54-62.] He questioned Riley on the possibility of bullets with the different compositions being produced at the same plant on the same day. [July 14, pp. 660-62.] He further asked Riley about tests he had conducted, when a single box of bullets contained bullets with twelve different elemental composition. [July 14, pp. 63-65.] He inquired into the number of elements Riley used to show *678 a compositional match. [July 14, pp. 107-10.] He also questioned Riley on the existence of any scientific standards to guide his interpretations. [July 14, pp. 110-13.]
Dr. Morris then reviewed Riley’s data and testified that the bullets in Patricia Paglia’s body and the one seized from the Rye, N.H., basement didn’t have sufficiently similar elemental compositions to support a conclusion, based on scientifically accepted principles, that the bullets came from the same box. [July 15, pp. 36-50.] Morris further testified that the manufacturing process for ammunition factored into his conclusion in that “there is no way to know how many bullets have been produced that would have the same elemental composition.” [July 15, p. 50.]
The NRC report certainly would have helped support Morris’s conclusions and the defendants’ attack on Riley’s credibility. Given the report, the Commonwealth concedes that Riley would not now be able to testify that the bullets came from the same box of ammunition. But, this does not make the report, or any new expert testimony based on the report, newly discovered evidence for the purpose of determining whether a new trial is warranted under Mass.R.Civ.P. 30.
The report certainly sheds new and veiy critical light on the evidence presented at the trial in 1987, but this does not make the report newly discovered evidence. See LeFave, 430 Mass at 177-78. As the Supreme Judicial Court stated in LeFave, there exists
a conflict between the constantly evolving nature of science and the doctrine of finality. In weighing these competing factors along with the interests of justice, we have concluded that expert testimony may not be considered newly discovered for the purposes of anew trial motion simply because recent studies may lend more credibility to an expert that was or could have been presented at trial.
430 Mass, at 181.
Conclusion
There is no doubt that the ground has shifted as to expert CABL evidence. If this case was tried today, a Special Agent of the FBI could not offer the “same box or batch” opinion. The prosecutor in this case did argue that piece of expert evidence to the jury in an attempt to corroborate the Commonwealth’s key witness Karen Moodie.
Still it is important to remember that the Commonwealth did not base its case on CABL evidence alone. The jury obviously credited Karen Moodie’s extensive testimony. See Commonwealth v. Daye, 411 Mass 719, 722, 725 (1992). Itwas corroborated, in part, by some ballistics evidence establishing that Patricia Paglia was killed by a .38 caliber bullet (shot by a gun with a rifling system of five bands and grooves with a right twist), the finding of a bullet in the cellar of the Rye house, and the recovery of .38 caliber ammunition under a bridge in Rye, N.H. In addition, a witness such as Special Agent Riley could still testify, consistent with the NRC report, that the Paglia bullet and the Rye basement bullet had been analyzed using the CABL techniques and found to be analytically indistinguishable. He could also testify that, although there is the possibility of false positives, the fact that the two bullets are analytically indistinguishable increases the probability that the two bullets came from the same substrata of a manufacturer’s lead melt (i.e. the same CIVL). All of this also would corroborate Karen Moodie. Finally, the prosecutor could argue to the jury that this expert testimony establishes a reasonable inference that the defendants were linked to both bullets. NRC Report, p. 102. Given all of this, the inclusion of Special Agent Riley’s opinion about the “same box or batch” — an opinion that was hotly contested at trial — does not cast real doubt on the justice of the conviction. Given the full airing given to Dr. Morris’ contrary opinion — an opinion that is echoed by the recent NRC report — there is no “substantial risk that the jury would have reached a different conclusion” had a limited portion of Special Agent Riley’s opinion been excluded at trial.
The motion is Denied.

 Initially the defendants pressed additional due process arguments that alleged prosecutorial misconduct. Those arguments have been withdrawn and abandoned.

‘The National Research Center is an association of leading scientists, the members of which are drawn from the National Academy of Sciences, the National Academy of Engineering and the Institute of Medicine.” Commonwealth v. Fowler, 425 Mass. 819, 821 n.6 (1997).

Analogies are of limited use but one might be helpful here. Given the advances in science represented in the NRC report, CABL evidence could be likened to blood type evidence. Assume a defendant has a relatively rare blood type, e.g. A negative, and assume the same type of blood is found at the crime scene. An expert could testify to the ability to type human blood, and the rarity of A negative blood and the fact that the defendant had this rare blood type. The expert, of course, could not opine that the blood came from the defendant. The prosecutor, however, could argue that inference to the jury.

For example, Mr. Tobin obtained a number of analyses of large lead pours in 1998 and 1999 from two of the larger lead manufacturers (although there are numerous other manufacturers) and by what he explained as a “lucky” coincidence these manufacturers had also kept a few analyses from a decade before.

A1so undermining his credibility was Mr. Tobin’s insistence, under oath in an affidavit, that he had reviewed the transcript of the expert testimony presented at this trial and believed that Special Agent Riley and the prosecutor had knowingly withheld what he considered an exculpatory and “pioneering” report (i.e. the Lukens Report) from the defense. These allegations are surprising in that the trial transcript establishes that Dr. Morris, the defense expert, was very familiar with the Lukens Report. After the Commonwealth pointed out this inconsistency, Mr. Tobin filed a second affidavit which acknowledged that these serious allegations were mistaken. Of course, anyone can make an honest mistake, but this incident confirms Mr. Tobin’s tendency to jump to conclusions and his bias against Special Agent Riley.

The report did not question the chemical or statistical analysis; only the interpretation of such analysis.