## Commonwealth *vs.* Rolando Rodriguez.

Suffolk. February 7, 2002. - August 19, 2002.

Present: Marshall, C.J., Greaney, Cowin, Sosman, & Cordy, JJ.

*Homicide. Practice, Criminal,* Capital case, Instructions to jury, Presumptions and burden of proof, Argument by prosecutor, Comment by prosecutor, Assistance of counsel. *Witness,* Expert, Cross-examination.

At a murder trial, the judge's instructions to the jury on the presumption of innocence, viewed as a whole, adequately informed the jury that the presumption of innocence remained throughout the entirety of the case; further, the judge's instructions to the jury on the evaluation of expert witness testimony did not improperly shift the burden of proof to the defendant to prove the facts underlying the expert opinion and consequently the burden to prove that he lacked the specific intent to commit the charged offenses. [559-562]

At a murder trial, the prosecutor's failure to ask the defense expert whether opinions elicited during cross-examination were based on a "reasonable degree of medical certainty" did not render those opinions inadmissible, where the expert's responses conformed to the "consistent with" and "could have" language expressly condoned in *Commonwealth* v. *Nadworny*, 396 Mass. 342, 359 (1985), cert. denied, 477 U.S. 904 (1986). [562-563]

A criminal defendant failed to demonstrate that a question asked by the prosecutor during cross-examination of the defense expert impermissibly elicited consciousness of guilt evidence, where the prosecutor immediately stopped the line of questioning in light of the judge's stated concern about consciousness of guilt evidence, where the witness never answered the question put to him regarding the defendant's behavior after the murder, and where the judge properly instructed the jury on consciousness of guilt in her charge. [563-564]

At a murder trial, certain statements made by the prosecutor during questioning of the defense expert and in closing argument were properly based on the facts in evidence and inferences permissibly drawn therefrom, and did not assume facts not in evidence. [564-566]

At a murder trial, statements made by a prosecutor during opening statement and closing argument, referring to the victim's husband and children, did not constitute improper appeals to the jurors' sympathies. [566-568]

A criminal defendant failed to demonstrate that his trial counsel rendered ineffective assistance. [568] [*]

Indictment found and returned in the Superior Court Department on June 3, 1997.

The case was tried before *Regina L. Quinlan,* J., and a motion for a new trial, filed on October 3, 2000, was heard by her.

*Maxine Sushelsky* for the defendant.

*Kajal K. Chattopadhyay,* Assistant District Attorney (*John E. Powers, III,* Assistant District Attorney, with him) for the Commonwealth.

CORDY, J. Following a jury trial, Rolando Rodriguez was convicted of murdering the operator of a small convenience store during the course of a robbery. In addition to this conviction of murder in the first degree on a theory of felony-murder, he was also convicted of the underlying felony of armed robbery.[1] Rodriguez appeals from his conviction and from the denial of his motion for a new trial.

At trial Rodriguez contended that he lacked the specific intent to kill or rob because of his ingestion of drugs and alcohol just prior to the murder. On appeal he claims that (1) the judge's instructions to the jury on the presumption of innocence and the evaluation of expert witness testimony improperly shifted the burden of proof; (2) the prosecutor's cross-examination of the defense expert witness impermissibly elicited consciousness of guilt evidence and failed to satisfy the proper standard for expert testimony; (3) the prosecutor referred to facts not in evidence or inferable from the evidence, both in his cross-examination of the defense expert and in his closing argument; (4) the prosecutor improperly appealed to the sympathy of the jurors in his opening statement and closing argument; and (5) trial counsel provided constitutionally ineffective assistance of counsel by failing to object to or move to strike certain evidence at trial, and by failing to request curative instructions. Rodriguez also asks us to invoke our extraordinary power pursuant to G. L. c. 278, § 33E, to order a new trial, or to direct entry of a verdict of a lesser degree of guilt. We affirm the conviction and decline to exercise our power under G. L. c. 278, § 33E, to order a new trial, or to reduce the murder conviction to a lesser degree of guilt. We also affirm the order denying the motion for a new trial.

1. *Facts.* We summarize the evidence in the light most favor-

[1]On December 13, 2000, the armed robbery conviction and sentence were vacated by the trial judge as duplicative of the felony-murder conviction.

able to the Commonwealth, reserving certain details for discussion in conjunction with the issues raised. *Commonwealth* v. *Fowler*, 431 Mass. 30, 31 (2000).

a. *The Commonwealth's case.* The victim, thirty-two year old Kenia Melo, owned and operated a small convenience store, the Steven Jr. Market, in Chelsea, along with her husband Juan Luis Pimental. On Sunday, April 13, 1997, Melo and Pimental arrived at the market around 9 A.M., along with their son and daughter (six and seven years old). On arriving, Pimental took his son downstairs to the basement of the market to take a nap in the bedroom. Melo and her daughter remained upstairs in the store. At approximately 11:30 A.M., Norma Rosado, a woman living across the street from the market, observed a thin, dark-skinned man, wearing a baseball cap and jeans, walk into the market. She noticed bottles of shampoo and other items falling from the shelves of the market immediately after the man entered. Rosado then observed a local woman approach the market, scream, and run away. Shortly thereafter, she saw the same man leave the market without a baseball cap, and walk away counting money.

Gloria Magana went to the market twice that morning. As she approached on her second visit, she heard Melo screaming for her husband. Magana briefly entered the market and saw a young man on top of the counter, struggling with Melo. The man was stretched out across the counter with his chest on the counter top and his legs dangling in the air as he reached for the cash register. Magana fled from the market as the man threw himself to the floor, and as she left she heard Melo scream to her, "Gloria, Gloria, call the police, because I've been stabbed."

Meanwhile, Pimental was awakened by the commotion in the market upstairs. He heard the screams of his daughter calling down to him, "Pappy, Pappy, there is a thief." Pimental ran upstairs and saw a man lying on the counter with his feet dangling in the air. He grabbed a can from a nearby shelf and threw it at the man as he ran from the market. Pimental observed money in the man's hand as he opened the door to leave the market.

Pimental then turned his attention to his wife who stood bleeding by the entrance to the counter. She told her husband

that she did not know the man who had stabbed her and that the baseball cap and knife that had been left behind in the market belonged to her attacker. Pimental lay on the floor of the market with his wife as police and emergency medical personnel began to arrive. An officer on the scene administered first aid to Melo, but was unable to stop the flow of blood from her back. Melo lost consciousness as she was being transported from the market and died shortly thereafter. According to the medical examiner, Melo died of multiple stab wounds and the resultant blood loss.

Rodriguez came to Massachusetts from Puerto Rico in late February, 1997, and was living in Chelsea with his cousin, Theresa Santiago, three blocks from the market. Also living in the house were Santiago's three children and her roommate, Carmen Febres. Santiago was at home on April 13, 1997, and saw Rodriguez sleeping in his bedroom at 6 A.M. that morning. When she next saw Rodriguez around noon that day, he had just showered and was cleaning the rug in his bedroom. She observed scratches on his face and noticed that he had been doing laundry despite the fact that it was not his assigned laundry day.[2] Santiago also noticed that a large white-handled knife that she had used the previous night was missing from her kitchen butcher block set.

Both Santiago and Febres testified that Rodriguez appeared nervous and edgy on the afternoon of April 13 and into the next day, often looking out the windows and refusing to go outside. On April 15, after reading a newspaper article about the incident at the market, Febres and Santiago confronted Rodriguez and asked him whether he was involved. Rodriguez did not answer but asked to speak with Santiago privately, because she was "family." During this private conversation, Rodriguez stated, "Yes, it was me, but it was not me," and "I did it, but I don't know how I did it." He pleaded with Santiago to "let him go" and not to turn him in to police. Santiago telephoned Rodriguez's relatives in Puerto Rico and, along with Febres, listened to the conversation on another extension while Rodriguez spoke to his father. They overheard Rodriguez admit his involvement in the

---

[2]Santiago testified that each member of the household had assigned days on which they were to do their laundry and that Sunday was not Rodriguez's assigned day.

killing to his father and tell him that he wanted to return home to Puerto Rico.

Immediately after the telephone call, Febres left the apartment and drove to the Chelsea police department to inform police of Rodriguez's involvement in the killing. Soon after Febres departed, Rodriguez also left the apartment. He was subsequently arrested at South Station at approximately 12:15 A.M. on April 16, 1997. When he was interviewed by police, he admitted his involvement in the robbery at the market. Rodriguez told police that he remembered going to the market with a knife, struggling with a woman behind the counter, and taking money from the register, but stated that he did not remember stabbing the victim.

b. *The defense.* Rodriguez testified at trial and called an expert forensic psychologist to support his claim that he lacked specific intent to kill or commit robbery. On direct examination, Rodriguez testified that he drank alcohol and smoked marijuana on the afternoon of April 12, 1997, and continued to drink and smoke into the night at a nearby party. After leaving the party, Rodriguez bought crack cocaine in a local park and smoked it throughout the night and into the morning hours of April 13.[3] He testified that he returned home to the apartment in Chelsea at some point that morning, but that he had no memory of leaving the apartment again or of taking a knife or cap with him at any point. Likewise, he did not recall going to or being inside the market on April 13. He did, however, remember being in an enclosed area, seeing a shadow, being grabbed, and falling on top of something.

Rodriguez claimed the next thing he remembered about April 13 was waking up in his bed and noticing money in his possession that was stained with blood. He felt scared and confused over the following hours and days as he heard about the incident at the market from Santiago and various media accounts. While he did not remember the incident, Rodriguez

[3]Rodriguez's testimony that he was on an all-night drinking and drug binge on April 12, and into the morning hours of April 13, was contradicted by testimony from Febres, Santiago, and Santiago's son. Febres testified that she saw Rodriguez at home before midnight on April 12, and all three witnesses testified that they saw Rodriguez sleeping in his bed early on the morning of April 13.

came to assume that he had been involved in the killing at the market. After speaking to Santiago, he attempted to fly back to Puerto Rico on April 15, but was unsuccessful in booking a flight. Rodriguez was at South Station intending to board a bus to New Jersey when he was arrested.

Dr. Alan Brown, a forensic psychologist, testified that, assuming a person had ingested a large quantity of crack cocaine, marijuana, and alcohol without sleep and without food, "it would be extremely unlikely that he would be able to form the specific intent" to rob or to kill. He also testified that a person having ingested the quantities of drugs and alcohol claimed by Rodriguez would be impaired in his ability to think through problems, make rational choices, and remember his thoughts and actions.

*2. Discussion.*

a. *Jury instructions on presumption of innocence and the evaluation of expert witness testimony.* Rodriguez claims that the judge's instructions to the jury regarding the presumption of innocence and how they should evaluate expert witness testimony improperly shifted the burden of proof to the defendant in violation of his constitutional right to due process. No objections to these instructions were made at trial and we therefore review the claimed errors to determine whether they created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Gunter*, 427 Mass. 259, 266 (1998); *Commonwealth* v. *Torres*, 420 Mass. 479, 483 (1995).

"Error in a charge is determined by reading the charge as a whole, and not by scrutinizing bits and pieces removed from their context." *Commonwealth* v. *Gunter, supra* at 267, quoting *Commonwealth* v. *Grant*, 418 Mass. 76, 85 (1994). Further, "[j]udges need not deliver their instructions in any particular form of words, so long as all necessary instructions are given in adequate words." *Commonwealth* v. *Torres, supra* at 484. See *Commonwealth* v. *Sinnott*, 399 Mass. 863, 878 (1987); *Commonwealth* v. *Martorano*, 355 Mass. 790 (1969). Here, the judge's instructions were adequate with respect to both the presumption of innocence and the evaluation of expert witness testimony. There was no error.

Rodriguez argues that the italicized language in the following

instruction, concerning the presumption of innocence, may have confused the jury so that they believed that the presumption did not continue to apply throughout the entire case:

> "The concept of presumption of innocence means exactly what it says. It means that the Commonwealth must prove the [d]efendant guilty of . . . these offenses beyond a reasonable doubt, and a [d]efendant will have the benefit of that presumption of innocence, unless and until the Commonwealth has proven each and every element of the crime charged by that standard. *It is only when the Commonwealth begins to introduce its evidence that this presumption in favor of innocence may begin to disappear. If the evidence against him goes in, the presumption may grow less and less strong,* but it is for you to determine, based upon all of the evidence, whether or not the Commonwealth has overcome that presumption." (Emphasis added.)

The instruction is nearly identical to the instruction we upheld as sufficient in *Commonwealth* v. *Powers*, 294 Mass. 59, 63-64 (1936). See *Commonwealth* v. *Gunter*, *supra* at 266-267. Cf. *Commonwealth* v. *Kane*, 19 Mass. App. Ct. 129, 139 (1984) (instruction erroneous where judge instructed "[t]he presumption of innocence remains with the defendant until evidence of guilt is *introduced*" [emphasis added]). It correctly informs the jury that they must determine, "based upon all of the evidence," whether the Commonwealth has overcome the presumption. The judge's other statements, such as, "It is only when the Commonwealth begins to introduce its evidence that this presumption in favor of innocence may begin to disappear," while not preferred, were simply a way of conveying to the jury that it takes evidence to overcome the presumption of innocence. Moreover, at the beginning of the trial the judge instructed the jury that "a [d]efendant is presumed to be innocent, and that presumption continues unless and until the Commonwealth proves each and every element of the crimes charged beyond a reasonable doubt." Viewing the instructions on this issue as a whole, we are satisfied that she adequately informed the jury that the presumption of innocence remained throughout the entirety of the case. There was no error.

Rodriguez also claims the following instruction on the evaluation of expert testimony had the effect of improperly shifting the burden of proof to him to prove the facts underlying the expert opinion and consequently the burden to prove that he lacked specific intent to commit the charged offenses:

> "The testimony of an expert may be helpful in determining issues [that] are beyond your everyday experience. However, an opinion given by an expert should be disregarded if you find the assumptions upon which it is based have not been proven or if you determine that the opinion is no more than mere speculation or guess from subordinate facts which do not adequately support the conclusion reached. . . . However, you may accept the opinion of an expert where you find the basic facts to have been proven, and the way you find that those basic facts give adequate support to the expert opinion is for you to decide."

One of the purposes of instructions on expert testimony is to remind the jury that they are the sole judges of credibility, and to guard against the possibility that designation of a witness as an expert might create the misimpression among the jury that they must defer to his opinion. *Commonwealth* v. *Richardson*, 423 Mass. 180, 185 (1996). In a case such as this one, where the expert opinion was based on hypothetical questions concerning the likely effect on the defendant of the ingestion of certain amounts of drugs and alcohol, under certain conditions, "[t]he jury should, on request, be instructed that it may give weight to the expert's opinion only if it finds all of the assumed facts [here, that the drugs and alcohol were consumed as and when claimed] to be true." P.J. Liacos, Massachusetts Evidence § 7.7.3(b), at 411 (7th ed. 1999). See Massachusetts Superior Court Criminal Practice Jury Instructions § 4.7.1 (Mass. Continuing Legal Educ. 1999).[4] See also *Commonwealth* v. *Taylor*, 327 Mass. 641, 649 (1951), and cases cited. On this point, the judge's instruction was correct, with one caveat. The judge used the word "proven" rather than "true." While it may

---

[4] With regard to expert opinion based on a hypothetical question, Massachusetts Superior Court Criminal Practice Jury Instructions § 4.7.1 (Mass. Continuing Legal Educ. 1999), states the following:

be a distinction without a difference, the use of the word "true" is better practice because it minimizes any potential confusion with the concept of "burden of proof." See Massachusetts Superior Court Criminal Practice Jury Instructions, *supra.*

In the context of the judge's charge as a whole, Rodriguez's broader claim of improper burden shifting on the element of specific intent is without merit. The judge repeatedly instructed the jury that the Commonwealth bore the burden of proving that the defendant acted with the requisite specific intent, stating, for example: "As I told you before, a [d]efendant has no burden of proof in a trial. . . . [A] [d]efendant is not required to prove to you an impairment of his mental capacity. The burden remains always on the Commonwealth to prove beyond a reasonable doubt the essential elements, and to prove in this instance that the [d]efendant had the mental capacity necessary for the various crimes . . . ." We therefore reject Rodriguez's argument that the jury could have been misled into believing that the burden of proof shifted to him on any element of the offense.

b. *Cross-examination of the defense expert.* Rodriguez argues that the prosecutor failed to ask the defense expert whether the

---

"This witness offered you an opinion that was based on certain assumed facts. It is permissible for a witness to testify in that form because it is your responsibility — and not the witness's — to determine from all the evidence what the facts are.

"Such an opinion is of no use to you unless the facts that the witness has been asked to assume, and on which his or her opinion is based, are in fact true.

"If you determine that one or more significant facts the witness was asked to base his or her opinion on are not true, then his or her opinion is not relevant to the facts of this case, and you should not consider his or her opinion in your deliberations.

"Where an expert witness testifies to an opinion that is based on certain assumed facts, you may consider that opinion only to the extent you believe the assumed facts are true. As I have told you, you are the sole judges of the truth of the facts in the case. If you believe that one or more significant facts on which the witness was asked to base his or her opinion on are not true, then his or her opinion is not relevant to the facts of this case and you should not consider the opinion in your deliberations."

opinions elicited during cross-examination were based on a "reasonable degree of medical certainty," thereby rendering those opinions inadmissible. Because defense counsel objected to the expert's testimony in this regard, we review the judge's ruling to determine error, and, if so, whether it was prejudicial. See *Commonwealth* v. *Jaime,* 433 Mass. 575, 577 (2001), and cases cited.

On cross-examination, the prosecutor posed a series of hypothetical questions to Dr. Brown concerning whether certain actions and behavior, if engaged in by an individual, would be "consistent with" someone who "knew what he was doing" or "understood what he had just done."[5] The questions did not specifically ask for Dr. Brown's opinion "to a reasonable degree of medical certainty." Admitting the testimony elicited by the questions was not error, where, as here, Dr. Brown's answers to the questions conformed to the "consistent with" and "could have" language expressly condoned in *Commonwealth* v. *Nadworny,* 396 Mass. 342, 359 (1985), cert. denied, 477 U.S. 904 (1986) ("Use of the phrases 'consistent with' and 'could have' does not render [a medical expert's] testimony incompetent"). This is particularly so on cross-examination of an expert, where the opposing side may, by such questions, probe the weight to be given to the expert's previously stated opinion.

Rodriguez further claims that the prosecutor attempted to elicit evidence relating to consciousness of guilt in his cross-examination of the expert witness, and that the judge erred in failing to strike the evidence and in not giving either a curative instruction or a consciousness of guilt instruction during the cross-examination.[6] Because this objection was not raised at trial, we review any error for a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Squailia,* 429

---

[5]For example, at one point the prosecutor asked, "When an individual . . . returns back to his house, having run from the place where he had taken the money. That person comes home, takes his clothes off immediately, throws them into a washing machine, takes a shower, would . . . those actions be consistent with an individual who understood what he had just done?"

Dr. Brown replied, "Yes, it would be consistent with. It wouldn't prove it, but it certainly would be consistent with."

[6]The judge fully and properly instructed the jury on the limitation of the use of consciousness of guilt evidence in her charge.

Mass. 101, 105 (1999); *Commonwealth* v. *Hunter*, 427 Mass. 651, 655 (1998).

The prosecutor asked: "Doctor, what about hypothetically in the aftermath of an event occurring, and I'm referring to the facts I've just laid out to you. He went to the store, the person being armed, the person running, disrobing, taking a shower, if the events immediately thereafter that person acted extremely nervous and edgy, would that have an impact on your opinion as to that individual's mental capacity to commit a crime?" Defense counsel objected to the question on grounds unrelated to the consciousness of guilt objection he raises on appeal. The judge then expressed her own concern about the question, stating: "Your focus and your questions [are] on evidence which would be in the nature of consciousness of guilt. . . . [M]y problem is I have to instruct and make sure they don't convict on consciousness of guilt." At this point the prosecutor stated, "I will stay away from that, Judge," and the witness never answered the question previously posed to him.

Where the prosecutor immediately stopped the line of questioning in light of the judge's stated concern about consciousness of guilt evidence, the witness never answered the question put to him regarding behavior after the incident, and the judge properly instructed the jury on consciousness of guilt in her charge, there was no error.[7] The fact that the judge did not specifically relate her consciousness of guilt instruction to Dr. Brown's testimony, or opt to give such an instruction during the expert's cross-examination, was within her discretion. See *Commonwealth* v. *Ferguson*, 365 Mass. 1, 11 (1974); *Goldman* v. *Mahony*, 354 Mass. 705, 711 (1968).

c. *Facts not in evidence.* Rodriguez claims that the prosecutor impermissibly assumed facts not in evidence (and not inferable from the evidence), both in his questioning of the expert wit-

[7]Dr. Brown did answer an earlier question during cross-examination which called for his opinion on whether certain actions, including some occurring just after the crime, would be consistent with an individual who understood what he had just done. See note 5, *supra.* Rodriguez does not specifically reference this question in his argument regarding the improper elicitation and admission of evidence of consciousness of guilt. The question and answer were proper in any event as relevant to his mental state at the time of the crime, and not merely evidence of consciousness of guilt.

ness and in his closing argument. Prosecutors must limit the scope of their arguments to facts in evidence and inferences that may be reasonably drawn from the evidence. See *Commonwealth* v. *Good*, 409 Mass. 612, 623 (1991), and cases cited. They must also take caution not to misstate the evidence. See *id.* "In analyzing a claim of improper argument, the prosecutor's remarks must be viewed in light of the 'entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial.' " *Commonwealth* v. *Lamrini*, 392 Mass. 427, 432 (1984), quoting *Commonwealth* v. *Bourgeois*, 391 Mass. 869, 885 (1984).

During his cross-examination of Dr. Brown, the prosecutor posed a hypothetical question about a scenario in which a person "goes into a kitchen, grabs a knife, *takes a bag, takes a hat* and heads out the door" (emphasis added). In his closing argument the prosecutor argued: "[The defendant] entered the store with a knife and *a bag, and a hat for a disguise . . . . He took the baseball hat. He took the bag,* the tools of the trade of a robbery, and he headed out the door . . . . I ask you, Ladies and Gentlemen, when an individual walks into a store armed with a knife and *a bag of sufficient room to carry money, and a hat to cover a distinctive scar over his eye,* is that consistent with somebody who doesn't know what he is doing . . . ?" (Emphasis added.)

Rodriguez argues there was no evidence to support the claim that he purposely wore the cap to disguise himself or to cover a distinctive scar. The baseball cap was found on the floor in the market by a Chelsea police officer. It was identified by Melo, in statements made to her husband immediately after the stabbing, as belonging to her assailant. Rosado testified that she observed a man wearing a dark baseball cap enter the market at the time of the incident and subsequently flee the market without a cap. Finally, a witness, who shared the apartment with Rodriguez, identified the cap as having been missing from his room on April 13, 1997. Given the uncontested existence of a distinctive scar on Rodriguez's head, the overwhelming evidence linking the cap to Rodriguez, and the cap's use in the robbery, the prosecutor's statements were properly based on the facts in evidence and inferences permissibly drawn therefrom.

Rodriguez further argues that the prosecutor's references to a bag found at the market were improper because there was no evidence linking Rodriguez to the bag and the bag was not admitted in evidence.[8] However, both Febres and Santiago testified that the bag found at the market belonged to Santiago, and Pimental testified that it did not belong to the store. Where there was ample evidence that the bag in question was found at the scene of the robbery, and that it belonged to Santiago, with whom Rodriguez lived, we conclude that the prosecutor's statements were reasonable inferences to be drawn from the evidence. There was no error.

d. *Appeals to juror sympathy.* Rodriguez claims that the prosecutor made improper appeals to the jurors' sympathies by referring to the victim's husband and children during his opening statement and closing argument. He correctly states that a prosecutor should not play on the sympathy or emotions of the jury, see *Commonwealth* v. *Good, supra* at 623, and urges that the prosecutor's statements in this regard crossed the line into improper argument. We disagree.

The prosecutor is entitled to "tell the jury something of the person whose life [has] been lost in order to humanize the proceedings." *Commonwealth* v. *Degro*, 432 Mass. 319, 323 (2000), quoting *Commonwealth* v. *Santiago*, 425 Mass. 491, 495 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998). In his opening statement, the prosecutor stated:

> "By all accounts, April 13th of 1997 started off like any other day for [the victim] and her family. That morning when they came to open the store, they had no idea that within a few short hours that day, that normal Sunday morning, a morning not unlike any morning they had come to open the store, would turn into that family's worst nightmare. Within a few short hours [the victim's husband] would lose his wife. The children would lose their mother, and [the victim] would lose her life."

Shortly thereafter, the prosecutor continued:

---

[8]The bag was admitted for identification only, but at the close of evidence, the judge ruled that the prosecutor could refer to a photograph of the bag in his closing argument.

"Earlier that morning [the victim's husband] took his young son . . . and they went downstairs to the basement to take a nap. [The victim's seven year old daughter] decided she wanted to stay upstairs with her mom, so she remained behind the counter of that store, sleeping on a comforter. It was about seven minutes before a man would enter that store and change that family's life forever."

The evidence at trial bore out each of the claims in the prosecutor's opening. There was no error.

Rodriguez also challenges similar remarks made by the prosecutor during his closing argument:

"But what happens when you're in the right place at the right time, and you none the less meet a violent end? That's the story of [the victim], a 32-year-old store clerk who was cut down inside her very own convenience store in Chelsea, a store that she owned with her husband for about two years, a store that she had worked in countless other times before, a store that she thought nothing of bringing her family there, her daughter, her son, a place where she thought nothing about working behind that counter alone, a place that [the victim's husband] thought nothing about going downstairs and taking a nap. Yet [the victim] was brutally murdered inside her convenience store, fatally stabbed over what ended up being a mere 60 dollars in U.S. Currency. . . .

"The [d]efendant testified that he came to this country because he wanted to make a better life for himself. Well you know, so did [the victim]. She, too, was Hispanic. She came to this country, married, three children, owned a store. She functioned in a city. The defendant apparently could not, but unfortunately for [the victim], she was in the right place at the right time."

While the prosecutor's references to the victim's family and children in his opening and closing were certainly sympathetic, they were not excessive, nor were they the focal point. See *Commonwealth* v. *Degro, supra* at 326-328 (references to victim's family and children properly limited and used to "set the scene"). When viewed in the context of his entire argument, we do not find the prosecutor's statements to have been

improper. See *id.* at 326-327; *Commonwealth* v. *Sanna*, 424 Mass. 92, 107-108 (1997).

e. *Ineffective assistance of counsel.* Rodriguez claims that his trial counsel was ineffective because he (1) failed to object to the judge's instructions on the presumption of innocence and the use of assumed facts in questioning the expert witness; (2) failed to object to or move to strike the prosecutor's references to Rodriguez wearing a cap as a means of disguising himself; and (3) failed to object to or move to strike the prosecutor's sympathy appeals to the jury during his opening statement and closing argument. The claimed "failures" of counsel all relate to alleged errors at trial that we have determined were not errors at all. Consequently, the ineffective assistance of counsel claim based on counsel's failure to object to those same errors must fail as well. See *Commonwealth* v. *Murphy*, 426 Mass. 395, 404 (1998); *Commonwealth* v. *Waite*, 422 Mass. 792, 807 (1996).

3. *Conclusion.* We conclude that none of Rodriguez's claims on appeal warrants reversal. Having reviewed the entire record pursuant to G. L. c. 278, § 33E, we further conclude that the interests of justice do not require the entry of a verdict of a lesser degree of guilt on the murder conviction or a new trial.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*