Macdonald, D. Lloyd, J.
Before the Court is the defendant John Petetabella’s amended motion for a new trial in connection with his 1964 conviction for first degree murder, assault and battery with a dangerous weapon and five counts of armed robbery. The issues were extensively briefed, and a hearing was held. The Court DENIES the motion for the reasons that follow.
I. Pertinent Facts
On December 22, 1963, the defendant and Joseph Robideau (“Robideau”) robbed a Fall River grocery store at gunpoint. (Because the defendant testified at trial and admitted — -with exceptions to be noted — to the substance of the Commonwealth’s case, the factual recitation here is according to the defendant’s own account.) In the course of the robbery and after removing the female sales clerk’s wallet, the defendant pis *464 tol-whipped a man working behind the meat counter with such force that the defendant broke the protective guard of his pistol.
Following the robbery, Petetabella and Robideau joined several friends in a heavy night of drinking on the occasion of what was described as a bachelor party for his friend, Gerald Sousa (“Sousa”). During the course of the partying, the defendant suggested that they “hit" a bar before closing time, and at approximately 1:00 a.m. (on the 23rd), the defendant, Sousa[1] and Robideau, robbed Padden’s Café in Fall River.
In the course of the robbery, the defendant forced the proprietor and a male patron into the kitchen area where they were ordered to lie face down on the floor. The defendant and Sousa removed the victims’wallets. The defendant then shot dead the proprietor. Sousa, who had his own gun drawn, shot at the patron as he lay on the ground, but the bullets missed.
While the defendant and Sousa were in the kitchen, Robideau held two female patrons at knife-point with the women kneeling on the ground. As the defendant and Sousa ran from the kitchen area, Sousa grabbed the pocket book of one of the females and took her wallet.
The defendant was arrested the next day in Providence. He made inculpatory statements to the arresting officers and, later, to the Fall River Police.[2] He was thereafter indicted for the charges on which he went to trial.
At the trial, the defendant was identified by the victims in the store robbery and by the survivors of the café robbery and shooting. In addition, he was identified by a co-defendant who had been indicted as an accessory, but who — in mid-trial — agreed to testify for the prosecution. Further, as noted, the defendant himself testified and admitted to all the material facts of the Commonwealth’s case except with respect to the identity of the third participant in the café robbery and shooting. Robideau also testified as a witness for Sousa, and in the course of doing so, he corroborated the Commonwealth’s allegations as to his and the defendant’s roles in the crimes.
Both the defendant and Robideau pleaded the defense of insanity, and each had psychiatrists testify on their respective behalfs. The defendant’s psychiatrist testified that the defendant had a “sociopathic personality disturbance, anti-social personality” but that he “was not ill to the point of. . . requiring treatment or institutionalization.” He stated that the defendant “can intellectually distinguish [between right and wrong], but in my opinion, he is not capable of controlling his behavior.”
The Commonwealth’s expert, the medical director of MCI Bridgewater, diagnosed the defendant similarly, to wit, “sociopathic personality disorder, anti-social type,” but he testified that the defendant was “completely capable of making ... a distinction [between right and wrong].”
In his closing argument on behalf of the defendant, his counsel adopted Robideau’s counsel’s prior argument as to the incapacity of a person with a sociopathic personality to control his conduct. However, with the death penalty still extant in 1964, the main thrust of counsel’s closing was directed to the defendant’s age, to the bleak circumstances of the defendant’s upbringing and to the proposition that the defendant never had a chance in life and, therefore, did not deserve to die for his admitted crime:
This is the most important day in my client’s life. He will never get another chance to have a jury decide whether he shall live or die. Here is a man whose background [is] one of complete rejection from the time he was born and the doors were slammed in his face. [This] is a boy who celebrated his 21st birthday last week sitting in this courtroom charged with first degree murder . . . He doesn’t say that what he did was right. Nobody makes that claim at all. But I ask you to consider these things. And you, as society, are you going to make the final rejection and say, “You don’t belong here”?
The jury deliberated three hours before returning guilty verdicts against the defendant, Robideau and Sousa for first degree murder and the related assault and robbery charges. However, as to each defendant, the jury recommended that the sentence of death not be imposed.
The defendant did not appeal his conviction. There is no indication in the record whether Robideau appealed. Sousa did so, but the SJC affirmed his conviction. Commonwealth v. Sousa, 350 Mass. 581 (1966).
Petetabella filed this Motion for a New Trial along with an affidavit. In his affidavit, Petetabella avers that he wanted to appeal his 1964 conviction but his trial counsel informed him that he could not appeal because he had testified and admitted his guilt. In addition, as part of the hearing on the instant motion, the Court took evidence from the defendant. The defendant testified to certain matters occurring during the trial. With regard to his decision to take the stand, he said that he did so only after his and Robideau’s counsel strongly advised him and Robideau to do so as their only way to avoid “the chair.” The defendant stated that Sousa’s counsel opposed their testifying. With regard to the decision not to appeal, the defendant said that his lawyer told him that he “could not appeal” because of the fact that he admitted to the crime. The defendant stated that he wanted to appeal but he “accepted” his lawyer’s advice because he did not think that he had a choice.
The defendant also described that during the course of the trial he and his co-defendants were handcuffed and fitted with a “belly chain” and leg irons. An officer armed with a rifle stood guard by the defendants through the trial.
*465 The defendant further described that he and his co-defendants were separated from their attorneys by about 10 feet. He noted, however, that occasionally his attorney would come over to him to consult on particular issues.
The trial was held in hot weather in June and early July 1964. The defendant testified that the windows of the courtroom were open to reduce the heat, but that because heavy construction was underway nearby, the resulting noise prevented him and others in the courtroom from hearing some of the evidence. The judge was aware that the noise was interfering with testimony. The defendant said that the judge noted the problem during the course of the trial.
II. Discussion
Petetabella contends that he is entitled to a new trial because:
He was deprived of his right to a direct appeal of conviction due to ineffective assistance of counsel.
The trial judge committed various structural errors, including an erroneous presumption of innocence instruction.
Women were systematically struck from the jury.
He was tried in shackles before the jury in the prisoner dock, and when he testified, he remained in shackles and under special guard.
Noise from the construction adjacent to the courthouse impeded the jury’s capacity to hear.
The jury instructions improperly took the issues of intent, malice aforethought, extreme atrocity and cruelty, and intoxication away from the jury.
The jury instructions shifted the burden to prove the voluntariness of his statements to the police.
The defendant’s waiver of his right not to testify was involuntary.
And the cumulative effect of trial errors deprived him of his right to a fair trial.
A. Standard of Review
Pursuant to Mass.R.Crim.P. 30(b), this court may order a new trial “at any time if it appears that justice has not been done.” “In the absence of constitutional error, the granting of a motion for a new trial. . . rests in the sound discretion of the judge.” Commonwealth v. Cintron, 435 Mass. 509, 517 (2001). Rule 30(b) motions are collateral attacks on final decisions. Commonwealth v. Lopez, 426 Mass. at 662. The defendant bears the burden of producing a credible reason to reverse the final decision, arrived at after trial or plea, that outweighs the risk of prejudice to the Commonwealth. Commonwealth v. Wheeler, 52 Mass.App.Ct. 631, 637 (2001), citing Lopez, 426 Mass. at 661-65. Moreover, in those cases where a defendant’s attack on his conviction or plea by way of a 30(b) motion “proceeds, necessarily on a basis extrinsic to an unavailable contemporaneous record, a judge is not required to accept the defendant’s self-serving affidavit as sufficient to satisfy his burden.” Wheeler, 52 Mass.App.Ct. at 637.
Pursuant to Mass.R.Crim.P. 30(c)(2), “[i]f a defendant fails to raise a claim that is generally known and available at the time of trial or direct appeal or in the first motion for postconviction relief, the claim is waived.” Rodwell v. Commonwealth, 432 Mass. 1016, 1018 (2000); see also Mass.R.Crim.P. 30(c)(2). The doctrine of waiver does not apply, however, where the error “creates a substantial risk of miscarriage of justice,” or when the defendant alleges, “that his failure to preserve an issue stems from ineffective assistance of counsel . . .’’ Commonwealth v. Randolph, 438 Mass. 290, 294-95 (2002) (internal citations omitted).
On a motion for a new trial, various standards apply to the claimed errors. In explaining the various standards of review, the SJC has said:
To summarize, when a trial judge addresses an unpreserved claim in a preappeal motion for a new trial, or when we determine that the “clairvoyance" exception applies because the state of the law was such that the defendant had no genuine opportunity to challenge the issue during prior proceedings, we review the claim as if it had been properly preserved. When we review an unpreserved claim on direct appeal from a conviction of first degree murder under [G.L.c. 278,] §33E, we consider whether the error caused a substantial likelihood of miscarriage of justice. In all other circumstances, we grant relief only if we conclude that the waived error created a substantial risk of miscarriage of justice.
Commonwealth v. Randolph, 438 Mass. 290, 296 (2002).
A claim is considered under the “clairvoyance” exception “if the theory on which the defendant has relied was not sufficiently developed at the time of trial to afford the defendant a genuine opportunity to raise his claim at that time. In such a case, ‘[i]f constitutional error has occurred, we reverse the conviction unless the error was harmless beyond a reasonable doubt.’ ” Commonwealth v. Nieves, 394 Mass. 355, 358-59 (1985) (citations omitted).
“A substantial risk of a miscarriage of justice exists when [the court] ha[s] a ‘serious doubt whether the result of the trial might have been different had the error not been made.’ ” Randolph, 438 Mass. at 297, quoting Commonwealth v. LaFave, 430 Mass. 169, 174 (1999). In analyzing the claim under this standard, the court “ask[s] a series of four questions: (1) Was there error? (2) Was the defendant prejudiced by the error? (3) Considering the error in the context of the entire trial, would it be reasonable to conclude that the error materially influenced the verdict? (4) May we infer from the record that counsel’s failure to object or raise *466 a claim of error at an earlier date was not a reasonable tactical decision?” Id. at 298 (internal citations omitted). “Only if the answer to all four questions is ”yes" may [the court] grant relief." Id.
In considering the third prong of the inquiry, the court must consider the evidence presented at trial and view the evidence in the light most favorable to the defendant. Randolph, 438 Mass. at 299.
B. Merits
Summary Disposition
Several of the defendant’s grounds for appeal can be dealt with summarily. The claim of error because of the alleged exclusion of women from the jury fails because it was defense counsel’s peremptory challenges that struck women from the jury. Thus, any error was waived.
Similarly, there was no contemporaneous objection to the alleged noise and inability of the jury to hear on account of it. Furthermore, from the Court’s review of the transcript, while there were multiple times that counsel or the trial judge had difficulty hearing a question or answer, the problem was addressed by the question or answer being repeated. And as noted above, the defendant testified at the evidentiary portion of the hearing that the judge acknowledged the problem during the course of the trial. On cross examination by the Commonwealth, the defendant accepted the District Attorney’s characterization that the judge “addressed" the issue at the trial. Accordingly, that argument is considered waived, as well.
Finally, as to the issue of the judge’s instruction with regard to whether the defendant’s statements to the police were voluntary and his statement to the jury that “[t]here is a presumption that a confession is voluntary, and that it is competent; and if there is not evidence to the contrary, the presumption stands,” the instruction is inconsistent with current law. Commonwealth v. Tavares, 385 Mass. 140 (1982). However, Tavares is not applied retroactively. Commonwealth v. Dyke, 394 Mass. 32, 37 (1985).
Voluntariness of the Defendant’s Trial Testimony
There is no evidence in the record to support a claim that the defendant’s decision to testify was involuntary. As noted, both he and Robideau chose to testify as witnesses for Sousa, and their accounts were largely consistent. A bare and conclusoiy assertion that his waiver of his right not to testify was involuntary is insufficient, especially in light of there being no objective evidence in the record to support it. Wheeler, supra, 52 Mass.App.Ct. at 637.
Further, the defendant’s claim that his counsel, in effect, instructed him to testify is not credible. It is directly contradicted by the record. Upon the defendant being called to the stand by Sousa’s counsel, the following colloquy occurred:
Mr. McGuire (defendant’s counsel): I want the record to show that as counsel for Petetebella I object to his being called as a witness.
The Court: Before you take the stand, Petetebella, your attorney has objected to your taking the stand as a witness. He has no right to claim a privilege for you, but you, in your own behalf, have the privilege of not testifying where you are a defendant in these cases.
However, if you take the stand and wish to testify, you are waiving any privilege that you may have. It is your decision to make. If you want to testify, all well and good.
The Defendant: Yes, sir.
The Court: What to you want to do?
The Defendant: Want to testify.
The Court: Okay.
Tr. at 1278-79.[3]
Taken together, the record discloses no evidence that the defendant’s decision to testify was involuntary. In his testimony before this Court, the defendant acknowledged that his alibi testimony for Sousa was a “lie” and that Sousa in fact was the third person at the robbery and shooting at the bar. The Court infers that, for reasons otherwise unexplained, the defendant and Robideau simply decided to do their friend Sousa the favor of providing him an alibi through their perjured testimony.[4]
Ineffective Assistance: Denial of Right to Appeal
As to counsel’s failure to appeal, Petetabella asserts that his trial counsel was ineffective by depriving him of his right to a direct appeal. Petetabella argues that pursuant to Commonwealth v. Frank, 425 Mass. 182, 184 (1997), he is entitled to have his claims for a new trial considered under the same standard as if they were being raised by a direct appeal.
Findings of Fact on the Issue of Defendant’s Failure to Appeal
The Court finds the defendant’s account of the circumstances of his failure to appeal as not credible. As noted before, the defendant testified that he wanted to appeal but that his counsel instructed him that he had no basis to appeal. From the Court’s review of the entire transcript, it is apparent that the defendant’s counsel was diligent in every aspect of his representation of the defendant at trial. Thus, it is unlikely that on such a basic issue as the defendant’s statutory right of appeal to the SJC pursuant to G.L.c. 278, §33E that counsel would have disregarded his client’s preference. More likely is the conclusion (which the Court reaches) that trial counsel advised the defendant not to appeal for two related reasons and that the defendant reasonably accepted the advice.
The first reason not to appeal was that the defendant, in substance, won at trial: Notwithstanding the overwhelming evidence that in the course of the rob *467 bery he had shot dead the owner of Padden’s Café execution-style (the substance of which the defendant admitted in his own testimony), the jury recommended that the defendant not be executed. As noted earlier, counsel’s final argument for the defendant was focused on achieving that objective and concluded with this plea: “[The defendant] doesn’t say that what he did was right. Nobody makes that claim at all. But I ask you to consider these things. And you, as society, are you going to make the final rejection and say, ‘You don’t belong here’?”
By the juiy’s verdict, counsel obtained the result he was seeking. Further, it was a reasonable trial objective in light of the weight of the evidence. Therefore, there was no reason to appeal unless otherwise there was a tangible benefit to be gained by doing so.
The second reason for the defendant to have chosen not to appeal is that if the defendant had appealed and prevailed, he would then have had to face the prospect of a new trial and with it the risk that the jury on re-trial would not recommend that he be spared execution. Because the defendant (contrary to his lawyer’s advice) chose to testify, the defendant’s trial testimony would have been admissible at any subsequent trial. As referenced several times previously, in his testimony the defendant admitted to all the material facts of the Commonwealth’s case. Thus, a second conviction was a near certainty and with it the risk of a death sentence. The original jury’s verdict recommending leniency would not have barred on double jeopardy grounds the presentation of the capital issue at the second trial. See generally Commonwealth v. Arsenault, 361 Mass. 271, 293-94 (1972).[5]
The Court concludes (a) that, as a matter of fact, the defendant’s counsel did not instruct the defendant that he could not appeal and (b) that the defendant voluntarily and knowingly waived his right to appeal because of the tangible risk of a worse ultimate outcome were he to have prevailed on an appeal.
Alternatively, even if the Court were to accept the substance of the defendant’s version of the interaction that he had with his counsel on the filing of an appeal, he would not be entitled to a new trial. In their papers, counsel for both the Commonwealth and the defendant submitted that the U.S. Supreme Court’s decision in Roe v. Flores-Ortega, 528 U.S. 470 (2000), provides the framework for the resolution of Petetabella’s claim that his trial counsel was ineffective by depriving him of his right to appeal.[6] The Supreme Court held that the first question in the analysis is whether counsel has consulted with the defendant. Id. at 478. The Court defined the term “consult” as “advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant’s wishes.” Id. Counsel has a constitutionally imposed duly to consult with a defendant regarding an appeal “if there is reason to think either (1) that a rational defendant would want to appeal (for example, there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing.” Id. at 480. If counsel does indeed consult with the defendant, then counsel only performs in a professionally unreasonable manner “by failing to follow the defendant’s express instructions with respect to an appeal." Id. at 478.
The defendant is not claiming that he and his attorney agreed an appeal would be filed and that the attorney negligently let the appeal fail, as in Commonwealth v. Frank, supra. Rather, Petetabella argues that his attorney improperly told him he could not appeal. Thus, the defendant’s affidavit establishes that he and his attorney addressed the issue of an appeal. And the defendant has not established that he instructed counsel to appeal and that counsel “fail[ed] to follow the defendant’s express instructions with respect to an appeal.” Roe, 528 U.S. at 478.
Finally, there does not appear in the trial transcript any error by the trial judge that posed a risk or likelihood of a miscarriage of justice by the defendant’s appeal’s not having been taken. As noted, co-defendant Sousa did appeal. Apart from the issues personal to the defendant as to the defendant’s counsel’s advice with regard to taking an appeal and as to the defendant’s decision to testify, the errors raised by the defendant’s motion for a new trial applied equally to Sousa. The SJC affirmed Sousa’s first degree murder conviction. Commonwealth v. Sousa, supra. There is no reason apparent to the Court that the SJC would have done otherwise with the defendant’s appeal.[7]
Defendant in Shackles
Petetabella also claims he is entitled to a new trial because during his trial, in the presence of the jury, he was bound by handcuffs, a “belly chain” and leg irons, all the while guarded by an armed officer. In 2005, the United States Supreme Court held that the Constitution forbids the use of visible shackles during a capital trial’s penalty phase, as it does during the guilt phase, unless that use is “justified by an essential state interest” — such as courtroom security — specific to the defendant on trial. Deck v. Missouri, 544 U.S. 622, 632-35 (2005).
A new constitutional rule is applicable to a defendant on collateral review only if it meets the test for retroactivity set forth in Teague v. Lane, 489 U.S. 288 (1989), and adopted by the SJC in Commonwealth v. Bray, 407 Mass. 296, 300 (1990). Anew constitutional rule is applicable retroactively on collateral review if it falls into one of two categories.
The first ... is that a new rule should be applied retroactively if it places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe. The second exception is that a new rule should be *468 applied retroactively if it requires the observance of those procedures that are implicit in the concept of ordered liberty.
Id. The second category is “available only if the new rule alters our understanding of the bedrock procedural elements essential to the fairness of a proceeding.” Tyler v. Cain, 533 U.S. 656, 666 n.7 (2001). Several courts have held that the new constitutional rule announced in Deck does not apply retroactively under Teagúe. See Marquard v. Secretary for the Dep’t of Corr., 429 F.3d 1278 (11th Cir. 2005).
No cases were found in which a court has held that the rule announced in Deck is to be applied retroactively. Moreover, the Deck decision does not-entirely prohibit the use of shackles on a defendant before a juiy, but rather, provides that restraints may be used if there is an “essential state interest” specific to a particular defendant. Deck, 544 U.S. at 632-35. In light of this conditional prohibition, Decks treatment of the shackles issue suggests that it is not one that implicates a right that is “implicit in the concept of ordered liberty.” Bray, 407 Mass. at 300. Further, given the defendant’s execution-style killing of the café proprietor, it was not unreasonable that stringent security precautions were taken at the defendant’s trial.
The Presumption of Innocence Instruction
The defendant argues that the Court’s presumption of innocence instruction was flawed, that it was a “structural error,” see, e.g., Neder v. United States, 527 U.S. 1, 8 (1999), and that he was prejudiced by it. The portion of the trial judge’s instruction at issue stated:
A defendant need not present evidence of his innocence. He has the right to remain inactive and secure until the government goes forward with evidence to prove him guilty; but a defendant has the right to take the stand if he wishes to do so.
The defendant submits that the Court’s error was “structural” and that without more he is entitled to a new trial. A structural error is an error that “so infringes on a defendant’s right to the basic components of a fair trial that it can never be considered harmless.” Commonwealth v. Bynoe, 49 Mass.App.Ct. 687, 693 (2000), quoting Arizona v. Fulimante, 499 U.S. 279, 309 (1991).
Neither the SJC nor the Appeals Court has directly addressed the issue. However, the Tenth Circuit has concluded that an alleged error in the presumption of innocence jury instruction is not structural. Walker v. Gibson, 228 F.3d 1217, 1235 (10th Cir. 2000). Moreover, the U.S. Supreme Court has stated that the “presumption of innocence” is more properly characterized as an “assumption” that is indulged in the absence of contrary evidence. Taylor v. Kentucky, 436 U.S. 478, 485 (1978). A presumption of innocence instruction is not required in every case. Kentucky v. Wharton, 441 U.S. 786, 789 (1979) (per curiam). Rather, the instruction is only required when “in light of the totality of the circumstances, there is a genuine danger that the jury will convict based on something other than the State’s lawful evidence, proved beyond a reasonable doubt.” Delo v. Lashley, 507 U.S. 272, 278 (1993) (per curiam) (quotations omitted).
Pursuant to these principles, the trial judge’s presumption of innocence instruction does not rise to the level of a structural error.
Absent structural error, the court considers whether the instruction created a substantial risk of miscarriage of justice. The defendant asserts that the instruction given by the trial judge impermissibly shifted the burden of proof. Commonwealth v. O'Brien, 56 Mass.App.Ct. 170, 174, n.5 (2002).
In O’Brien, the Appeals Court held the following instruction to be erroneous, when viewed in connection with a prosecutor’s remark questioning the defendant’s failure to oppose the prosecution’s case:
[I]t is only when the Commonwealth begins to introduce its evidence that the presumption in the defendant’s favor begins to disappear. As the evidence against him goes in, then the presumption grows less and less strong, and if at the conclusion of the case the Commonwealth has convinced you beyond a reasonable doubt of his guilt, then the presumption has disappeared entirely.
O’Brien, 56 Mass.App.Ct. at 174. In so concluding, the O’Brien court determined that the prosecutor’s remark, in combination with the instruction, could have potentially misled the jury into believing that once the Commonwealth introduces evidence of the defendant’s guilt the defendant must rebut such evidence in order to prevent the disappearance of the presumption of innocence. Id. at 174-75. See also, Commonwealth v. Kane, supra, 19 Mass.App.Ct. at 139.
In Commonwealth v. Rodriguez, 437 Mass. 554, 560 (2002), the SJC held the following presumption of innocence instruction sufficient:
The concept of presumption of innocence means exactly what it says. It means that the Commonwealth must prove the [defendant guilty of . . . these offenses beyond a reasonable doubt, and a (d)efendant will have the benefit of that presumption of innocence, unless and until the Commonwealth has proven each and every element of the crime charged by that standard. It is only when the Commonwealth begins to introduce its evidence that this presumption in favor of innocence may begin to disappear. If the evidence against him goes in, the presumption may grow less and less strong, but it is for you to determine, based upon all of the evidence, whether or not the Commonwealth has overcome this presumption.
Rodriguez, 437 Mass. at 560.
*469 The SJC noted the fact that the instruction correctly informs the juiy that they must determine, “based upon all of the evidence,” whether the Commonwealth has overcome the presumption. Id. The SJC further noted that while the trial judge’s statements that “[i]t is only when the Commonwealth begins to introduce its evidence that this presumption in favor of innocence may begin to disappear,” are not preferred, they were “merely a way of conveying to the jury that it takes evidence to overcome the presumption of innocence.” Id. See also Commonwealth v. Gunter, 427 Mass. 259, 266 (1998) (upholding an instruction that the government’s evidence may “overwhelm[ ] the presumption of innocence and cause! 1 it to dissipate and . . . disappear! 1 like it never existed”).
It appears that where the SJC and the Appeals Court have determined the presumption of innocence instruction to have been in error it was where the instruction conveyed that the presumption of innocence disappears as soon as any evidence of guilt is introduced. Here, while the trial judge’s instruction did not overtly state that the presumption disappeared, the instruction was not clear that the presumption continued until contradicted by proof beyond a reasonable doubt. As such, it was flawed. However, in context, the instruction did not pose a risk or likelihood of a miscarriage of justice. That is so for three reasons.
First, the instructions were otherwise unambiguous that the jury had to be convinced beyond a reasonable doubt as to the defendant’s guilt. There was no ambiguity as to the Commonwealth’s burden of proof.
Second, on its own terms, the judge’s charge did not suggest that the presumption evaporated upon the Commonwealth’s presentation of any evidence. To the contrary, judge instructed that the presumption remained “until the government goes forward with the evidence to prove him guilty” — in other words, until guilt was established beyond a reasonable doubt.
Third, even if there was error, it was harmless beyond a reasonable doubt. The defendant admitted in his own testimony to the essential facts alleged by the prosecutor: By his own account, he robbed the market, he pistol-whipped a witness there, he robbed the people in Padden’s café, and he shot dead the bar manager.
There essentially were no facts in dispute except whether Sousa was the third man in the Padden’s café robbeiy. Accordingly, if there were prejudice as to the presumption of innocence on account of the judge’s charge, it would have been suffered in the main by Sousa. As cited earlier, Sousa’s conviction was affirmed by the SJC. Commonwealth v. Sousa, supra. Any error as to the defendant was harmless.
Presumption of Innocence and the Insanity Instruction
As to the defendant’s insanity defense and the Commonwealth’s burden to prove it beyond a reasonable doubt, the Court appropriately instructed on the substance of applicable law. See Commonwealth v. Chester, 337 Mass. 702, 711-12 (1958).[8] Further, as noted, there was agreement between the defendant’s psychiatric expert and the Commonwealth’s expert as to the defendant’s diagnosis of sociopathy/anti-social type. I.e., the defendant’s expert did not diagnose him as psychotic or otherwise out of touch with reality such as to not be in contact with the world around him. The disagreement between the experts was exclusively as to whether the defendant could control his behavior.
The defendant’s evidence on the latter issue was weak[9] and the jury heard testimony from multiple witnesses as to the defendant’s conduct on the day of the homicide from which to make its judgment as to the defendant’s sanity. Further, the jurors had the first-hand experience of observing the defendant in person while he testified at length on direct and cross examination, which experience gave the jury an unusual opportunity to gauge for themselves the defendant’s mental state and faculties.
From the Court’s independent review of the transcript, the defendant neither gave expression to nor exhibited conduct consistent with a lack of criminal responsibility. Accordingly, any error in the trial judge’s instruction as to the presumption of innocence as it applied to the defendant’s insanity defense was harmless beyond a reasonable doubt.
Burden Shifting Instructions
The defendant submits that the trial judge’s instructions referencing the “presumption” that the defendant intended the consequences naturally flowing from his acts took the issues of intent, malice aforethought and intoxication from the jury. He also takes issue with the “presumption” instruction in connection with the defendant’s insanity plea. See generally Sandstrom v. Montana, 442 U.S. 510 (1979).
Taken individually, many of the challenged instructions do not suggest the shifting of the burden of proof and when read as a whole, the jury was clearly instructed that it was the Commonwealth’s burden to prove affirmatively the defendant’s guilt beyond a reasonable doubt. Further, “(a]n unconstitutional burden-shifting instruction is not grounds to upset a verdict if it appears ‘beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.’ ” Commonwealth v. Nolin, 448 Mass. 207, 218 (2007), quoting Chapman v. California, 386 U.S. 18, 24 (1967). See also Commonwealth v. Gibson, 424 Mass. 242, 254 (1997) (“If it can be said with reasonable confidence that the error did not contribute to the verdict, then it was harmless”).
*470 Any burden shifting error in the charge was harmless beyond a reasonable doubt. The defendant was identified by the victims of the initial robbery and the surviving witnesses of the café robbery and shooting. Two witnesses identified him as part of the trio who split the proceeds of the café robbery three ways. The wallets thereafter found in the apartment where the proceeds were split were identified as belonging to the café victims. And there was testimony from a cab driver who had taken three men from the apartment where the defendant, Robideau and Sousa had been before the café robbery to the area of the café. The cab driver showed the police where he dropped the three men, and there were three sets of footprints in the snow leading from that spot to the café. Most decisive in this regard, however, was the testimony of the defendant himself and of Robideau in which they admitted that they planned and executed the crimes essentially as alleged by the Commonwealth.
For all the above reasons, the defendant is not entitled to a new trial.
ORDER
The defendant’s Amended Motion for a New Trial is DENIED.

In the defendant’s trial testimony (he was called as a witness by Sousa’s counsel), the defendant denied that Sousa participated in the robbery. He said that Robideau joined him but that the third person was a man named “Red,” whom he met in another bar on the night of the robbery. However, when the defendant testified at the evidentiary hearing in connection with the instant motion, he said that he “lied” in his trial testimony and that Sousa was, in fact, the third member of the hold-up team.

It appears that at least some of these statements were suppressed on the motion of the defendant pursuant to the then-recent U.S. Supreme Court case of Escobedo v. Illinois, 378 U.S. 478 (1964).

Nhe defendant’s account that Robideau’s counsel joined in advising Robideau to testify is also contradicted by the transcript:
Mr. Sheehan [Robideau’s lawyer): “Your honor, may the record show that, as counsel for Mr. Robideau, I strongly object to him being called as a witness; and I so advise him.
The Court: Mr. Robideau, you have heard the objection by your attorney. Have you?
Robideau: Yes, sir.
The Court: And what is your pleasure? Do you wish to testify, or do you wish to remain silent? It is your privilege not to testify, unless you elect to testify.
Robideau: I wish to testify.
Tr. at 1384.

Particularly against the backdrop of the defendant’s acknowledged peijuiy, the defendant’s testimony at the hearing that his attorney instructed him to testify to save himself from “the chair” is not credible. The defendant’s (and Robideau’s) testimony as to “Red,” not Sousa, being the third robber was convincingly attacked by the District Attorney’s cross-examination. Experienced trial counsel — which the record reflects both the defendant’s and Robideau’s were — would have anticipated that suspect alibi testimony for their co-defendant Sousa would have increased the likelihood of the jury’s withholding a recommendation of leniency and, thus, would have increased the prospect of getting “the chair” on retrial.

In a post-hearing reply memorandum, the defendant submitted that the U.S. Supreme Court’s decisions in North Carolina v. Pearce, 395 U.S. 711 (1969), and Sattazahn v. Pennsylvania, 537 U.S. 101, 108-09 (2003), would bar retrial of the capital issue. It could be that if, today, the U.S. Supreme Court were faced with the double jeopardy issue on the facts in this case, the Court would find favorably for the defendant. However, in Sattazahn the Court affirmed the Pennsylvania Supreme Court’s affirmation of the imposition of the death penalty on retrial where the original trial judge had entered a life imprisonment sentence when the jury was deadlocked on the capital question. Further, apart from what is by its nature a speculative exercise as to prognosticating what the Court would do in 2010, the law of the land in 1964, i.e., at the time of the defendant’s trial, was the U.S. Supreme Court’s holding in Stroud v. U.S., 251 U.S. 15 (1919). And in Sattazahn the Court capsuled Stroud as standing for the proposition that a “life sentence imposed in connection with [an] initial conviction raises no double-jeopardy bar to a death sentence on retrial.” 537 U.S. at 106.

Neither the SJC nor the Appeals Court has specifically followed Roe v. Flores-Ortega Nonetheless, the SJC has recognized that the situation presented in Roe is different than the situation where counsel, in representing a defendant on appeal, has performed ineffectively. Commonwealth v. Goewey, 452 Mass. 399, 403 n.3 (2008). In addition, the SJC has also recognized that “there may be cases in which the loss of appellate rights was due to the deliberate and counseled choice of the defendant, and, in those cases, the defendant must abide by that choice.” Frank, 425 Mass. at 185, n.2.

Although, as noted, the Commonwealth submitted in its papers that the ineffective assistance of counsel issue with regard to the failure to have filed an appeal ought to be analyzed according to the Roe framework, at the motion hearing the Commonwealth argued that the applicable standard ought to be that which was in place at the time that counsel acted, i.e., 1964. In Commonwealth v. Lussier, 359 Mass. 393, 395 (1971), the Court applied the 6th Circuit’s formulation of the standard as controlling: “Only if it can be said that what was or was not done by the defendant’s attorney for his client made the proceedings a farce and a mockery of justice, shocking to the conscience of the Court, can a charge of inadequate legal representation prevail.” Scott v. U.S., 334 F.2d 72, 73 (6th Cir. 1964). Since the Court finds no risk or likelihood of miscarriage of justice under the Roe standard, a fortiori, there is none if the measure of counsel’s conduct was the demonstration of “farce and a mockery of justice.”

The core of the judge’s instruction on the insanity defense was as follows: “One whose mental condition is such that he cannot distinguish between right and wrong is not responsible for his conduct; and neither is one who has the capacity to discriminate between right and wrong, but whose mind is in such a diseased condition that his reason, conscience and judgment are overwhelmed by the disease and render him incapable of resisting and controlling an impulse which leads to the commission of a homicide, or other criminal acts.” Tr. at 1912. “So, Mr. Foreman and members of the jury, if . . . you are satisfied beyond a reasonable doubt of a defendant’s sanity at the time the acts were committed, then you will render such verdicts on each of the indictments as you think is warranted by the evidence, and in accordance with the instructions of law that I have given you.”

“An abnormality manifested only by repeated criminal or otherwise anti-social conduct” is insufficient to comprise a defense of insanity. Id. at 712, n.4.